COLE, Appellant, v. FITZGERALD, Executor of Estate of FITZGERALD, Deceased, Respondent.

St. Louis Court of Appeals, May 26, 1908.

1. PARENT AND CHILD: Gratuitous Services: Implied Contract. The general rule obtains that if a child of full age who has left home and become self-supporting, returns on the request of the parent and performs service for the parent, a promise is inferred to pay for such services, but it has been disregarded in this State and in this case it is unnecessary to make the decision turn upon it.

2. ——: ——: ——: Evidence. In an action for compensation for services by one member of a family to another, an understanding that the services were to be paid for may be established by indirect evidence.

3. ——: ——: ——: Prima-Facie Case. Where a father, an old man, sent for his daughter, who had been twice married and was fifty years of age, to come and stay with him and she came and rendered services in house work and other work about the premises, and where it was shown that the father said to various persons that he intended to pay her well for the work, and where there were circumstances indicating that she was aware of his purpose to pay her, this was sufficient, on the trial of her claim against his estate for compensation for such services, to submit to the jury the question as to whether there was an arrangement between the father and daughter that she was to be paid for her work.

Appeal from Franklin Circuit Court.—*Hon. R. Steel Ryors,* Judge.

REVERSED AND REMANDED.

*John W. Booth* for appellant.

In order to entitle plaintiff to have her case go to the jury it was not necessary for her to prove an express promise made by her father to her to pay for her services. The evidence was such that therefrom the jury would have been justified in finding an implied contract to pay therefor. The circuit court therefore

132 App—2

Cole v. Fitzgerald.

erred in taking the case from the jury, and its judgment should be reversed. Bonsieck v. Boonschmidt's Admr., 63 Mo. App. 421; Hart v. Hart's Admr., 41 Mo. 441; Guenther v. Birkicht, 22 Mo. 430; Morris v. Barnes, 35 Mo. 412; Snyder v. Free, 114 Mo. 360.

*Jesse M. Owen* and *O. E. Meyersieck* for respondent.

. (1) The law in Missouri is well settled that where the family relation exists, services performed by one member of the family, are presumed to be gratuitous, and the closer the relation, the stronger the presumption. And in the absence of a contract to pay, either express, or implied from the facts and circumstances in evidence, no recovery can be had. Wood v. Land, 30 Mo. App. 181; Louder v. Hart, 52 Mo. App. 377; Kotsuba v. Miller, 137 Mo. 161. (2) It is essential that there should have occurred what the name implies, a meeting of the minds of the parties on the subject of compensation—a common understanding about it. Fitzpatrick v. Dooley, 112 Mo. App. 173; Lawrence v. Bailey, 84 Mo. App. 107. (3) It is not sufficient that plaintiff may have secretly expected to receive wages, but both sides must have understood they were to be paid for. Tumility v. Tumility, 13 Mo. App. 448; Bircher v. Boemler, 204 Mo. 553. (4) Services rendered by a member of a family merely with a view to, or in expectation of a generosity of the party for whom the services were rendered, by a future will or gift, will not support an implied assumpsit. Guenther v. Birkicht's Admr., 22 Mo. 439.

GOODE, J.—Appellant is the daughter and respondent the executor of the last will of Squire Fitzgerald, who died February 9, 1904, at Gerald, in Franklin county, where he had resided many years. Appellant presented to the probate court of said county for allowance a demand against her father's estate for services rendered during thirty-five months as his house-

keeper.    Said services consisted of general domestic
work and are alleged to have been performed at the
special instance and request of deceased.    The demand
states the reasonable value of the services rendered dur-
ing the first twelve months at ten dollars a month and
of those rendered during the last twenty-three months
at twenty dollars a month, making a total of $580.    The
case was carried to the circuit court by appeal where,
on a trial before a jury, the verdict went for respondent,
pursuant to a peremptory instruction from the court,
and after appropriate motions the present appeal was
allowed.    No evidence was offered by respondent and
the court's instruction was equivalent to sustaining
a demurrer to appellant's evidence introduced in sup-
port of her demand.    Appellant was about fifty years
old at the time of the trial.    When quite young she
married a man named Lovercheck and went to reside
with him on a farm not far from Gerald.    Three chil-
dren were born of this marriage, two boys, Pliny and
Lester and a daughter Winnie.    Lovercheck died and
afterwards appellant married William Cole, with
whom she dwelt in her own home.    Later Cole died and
appellant then moved to St. Louis.    Meanwhile her
children had scattered, Lester and Winnie going to
Nebraska and Pliny to St. Louis county.    In the year
1900 appellant was called from St. Louis to take care of
her mother who was ill.    Squire Fitzgerald told one
of the witnesses about this but did not say who sent for
appellant.    She nursed her mother until the latter's
death on February 25, 1901.    Squire Fitzgerald was
then about seventy-two years old, nearly helpless and
in need of some one's care.    He desired appellant to
remain with him, which she did until he died three
years later in February, 1904.    After appellant went
from St. Louis to her father and mother, she performed
the household work "inside and outside" as one wit-
ness said; attended to all such tasks as cooking, taking

care of the rooms, making the fires and milking the cow; and occasionally she chopped wood and fed the horses and cattle, though generally this outside work was done by a hired man. Now and then for a brief interval a woman would be employed to assist in the labor of the household. While appellant was with her father he conducted a boarding house in the town of Gerald and the-drudgery incident to this business fell almost entirely on her. The boarders paid Mr. Fitzgerald for their fare and lodging, but on a few occasions he divided small sums of money, say fifty cents or a dollar, with appellant. In April, 1902, deceased wrote to his granddaughter, Winnie Lovercheck, to come from Nebraska and stay in his home with her mother. The granddaughter did so and remained until the death of deceased, occasionally contributing to the expense of the table from her own means. Having explained how appellant came to be in her father's home and what she did there, we will next recite the evidence relied on to establish a contract between her and her father, that she should be paid for her work. A witness testified, in substance, as follows: deceased told him appellant was not willing to stay at Gerald, was lonesome, and he sent for Winnie to come to stay with her; appellant thought she was not getting anything, but he expected to pay her well; he felt like she would come nearer making him a home than any other person and he would rather she would do it; she was complaining of not getting anything for her work, but he intended to pay her; said he meant to build a new house and did not know if it would do him any good, but it would do Bessie and Winnie good when he was gone. Witness said he was not sure the conversation about the house occurred in the same conversation in which deceased said he would pay appellant for her services. Another witness (Mrs. Pardee) testified deceased asked her to stay with his daughter a few days

while his wife was ill, saying he wished to give his daughter a rest. While witness was there deceased spoke about his wife and witness said she (Mrs. Fitzgerald) rested "mighty bad" and slept hardly any, which was hard on appellant and witness did not see how appellant stood it. Deceased answered: "I know that, but I intend for her to be well paid for it." The same witness had another conversation with deceased just before he moved into the new house and asked him if his daughter was going to stay with him, saying: "Who would you get if your daughter leaves you?" Deceased answered: "I am not going to give her up; she is going to stay with me; I do not want to break up housekeeping; I haven't many years to live and want to live in my home." Deceased told witness he was going to pay appellant well for taking care of her mother and also said: "I am going to pay her for staying with me;" but did not say how much he would pay her. Winnie Lovercheck testified she was in Nebraska when her grandfather wrote her to come to live with him and be a companion for her mother; that she came back in April, 1902, and stayed at her grandfather's. He was in feeble health then and only walked around a little. Her mother was doing the work and taking care of her grandfather. Witness swore deceased said he wanted her mother to stay there and take care of him; that he was old and did not want to break up housekeeping, and would rather have appellant there than any one else; that he did not want to go away and live with some one else, but wanted witness to stay with her mother and he intended to pay her (the mother) well. He wrote witness appellant was dissatisfied and wanted to return to the city (St. Louis) and therefore he wanted witness to come to her. He said he "would rather have her (appellant) take care of him and if she would stay there she would be well paid." He needed attention like a little child

and appellant would often have to stay in his room and watch him all night.      On cross-examination the witness, when interrogated about whether she expected her grandfather to give the new house, which cost $1,200 to her mother, answered: "No, sir; we thought he intended to pay her in some way."

In one compendium of the law, it is said a child living separate and apart from a parent in comfortable circumstances, is under no obligation to perform services for the parent without payment, as the family relationship no longer exists; and hence the presumption of an intention to pay for services obtains just as though there was no kinship.      Stating the proposition in a different form, the treatise says if a child of full age who has left home and become selfsupporting, returns at a parent's request, a promise is inferred to pay for services rendered.      [21 Am. and Eng. Ency. Law (2 Ed.), 1063; citing Parker v. Parker, 23 Ala. 459; Markie v. Brewster, 10 Hun (N. Y.) 16, 70 N. Y. 607; Wilsey v. Franklin, 57 Hun 383; Marion v. Farnan, 68 Hun 383; In re Strickland, 10 Misc. (N. Y.), 486.]      Those cases support the text, and Bell v. Moon, 79 Va. 341, supports the further statement of the text, that when children who have left home and set up for themselves, with adequate means of support, return to dwell under the parental roof, the law presumes a promise to pay the parents for their board, as it does when the parties are of no kin.      In this State the rule that no promise to pay for services is implied when the family relation exists, has been followed in cases where the relation had ended, and afterwards services were performed for a parent by an adult child who had a separate home and was self-supporting.      The question was adjudicated in Brock v. Cox's Admr., 38 Mo. App. 40, and Penter v. Roberts, 51 Mo. App. 227; and the common rule against the presumption of an intention to pay for services performed by a child for a parent was

applied without discussion, in the following cases wherein it appeared children who had left their parents, subsequently took care of them.    [Kostuba v. Miller, 137 Mo. 161, 38 S. W. 946; Bircher v. Boemler, 204 Mo. 554, 103 S. W. 40; Koch v. Hebel, 32 Mo. App. 103; Ronseik v. Boberschmidt's Admr., 63 Mo. App. 421; Lawrence v. Bailey, 84 Mo. App. 107; Allen v. Allen, 101 Mo. App. 676, 74 S. W. 396.]    All those decisions were rendered on evidence to prove children living in their own homes had opened those homes to their aged and infirm parents, or had rendered some service or given some attention to such parents—offices prompted by the heart and apt to be rendered without expectation of pecuniary reward.    But a child established in life may render a parent services of such sort as it would be unreasonable to presume were performed gratuitously.    Disputable presumptions are deduced from the ordinary course of life, and there are services which it is not according to custom for grown children, who have left home, to do for parents for nothing.    This case is a good illustration.    It is not so common for a child who has an independent home, to return to an aged but prosperous parent at his solicitation, and endure years of onerous toil in carrying on his business, without promise of reward, as to justify the presumption that appellant did this.    The doctrine of the Encyclopedia rests on a sound principle, and, if discreetly applied, accords with experience.    But in view of the previous trend of the decisions in this State, we will not hold proof of the simple fact that appellant bore the labor of the boarding house, would suffice to raise against the father, by implication of law, a promise to pay, and shift to respondent the burden of proving the work was done gratuitously and because of the family relation or from filial regard. The burden of making out a prima-facie case was on appellant in any event, and she carried the burden further

than simply proving the kind of work she did.    In order to show there was an arrangement between her and her father for payment, she introduced proof of other facts; and if this evidence was sufficient to raise an issue for the jury, instructions regarding the presumption the law would indulge in the absence of evidence would be improper.    [Bailey v. Railroad, 152 Mo. 449, 461, 52 S. W. 406, and cases cited; Fitzpatrick v. Dooley, 112 Mo. App. 165, 176, 86 S. W. 719.]    Hence we consider it unnecessary to decide what presumption would exist if appellant had proved no more than the kind of work she did for her father.    We will epitomize *infra* the facts in proof which we think sufficed to carry to the jury the question of whether or not there was an understanding between appellant and deceased for payment.    As was said in Smith v. Meyers, 19 Mo. l. c. 436, and, in effect in many cases, this question is to be determined by the jury on consideration of "the nature and degree of the relationship, the circumstances in life of the parties, and other matters which may affect it."

Even granting appellant was in her father's home as a member of the family, it was not incumbent on her to establish by direct evidence a contract to pay her; that is to say, by some writing or the testimony of witnesses who heard the parties come to an agreement.    It was enough for her to adduce evidence from which the jury might find she and the deceased understood her services were not voluntary, but were to be remunerated.    We have pointed out in previous opinions that when courts say an express contract must be shown in cases like this, they only mean the law will not imply a contract if the family relation existed, and do not mean a contract must be proved by direct testimony.    [Fitzpatrick v. Dooley, supra; Fry v. Fry, 119 Mo. App. 476.]    From the earliest cases on the subject in this State, the courts have uniformly held an agreement or understanding to pay for work done

by a member of a family, may be established by indirect evidence.    [Smith v. Meyers, 19 Mo. 433; Guenther v. Birkicht's Admr., 22 Mo. 439; Morris v. Barnes' Admr., 35 Mo. 412; Hart v. Hart, Admr., 41 Mo. 441; Cowell v. Robert's Excr., 79 Mo. 218; Reando v. Misplay, 90 Mo. 251, 2 S. W. 405; Sprague v. Sea, 152 Mo. 327, 53 S. W. 1074; Wood v. Land's Admr., 30 Mo. App. 176; Shannon v. Carter, 99 Mo. App. 134, 72 S. W. 495, and cases supra.]

The intention of deceased to pay appellant, was put almost beyond doubt by the testimony of witnesses who heard him express the intention, and her expectation of payment is shown by several facts, such as the giving up of her home in St. Louis, and return to her father by his wish and likely on his request, the kind of work she did, his financial status and ability to hire help, for he was worth about seven thousand dollars; his statements to witnesses that she was dissatisfied, thought she was getting nothing and wished to return to St. Louis; connected as some of those statements were with a declaration of his purpose to pay her well if she would remain with him, and the fact that she did remain.    All these circumstances were relevant to the main issue and tended to show deceased expected to pay and appellant expected to be paid.    The only fact needed and not directly proved, to weld the circumstances into a complete contract, is knowledge by appellant of deceased's purpose to pay her.    But the circumstances sufficiently indicate she was aware of his purpose, and continued to serve him in the belief he would carry it out, to support a finding by the jury. The entire evidence makes ignorance on her part of the statements and intention of her father, improbable. Indeed, there is a bit of direct testimony on the issue. When Winnie was asked if she expected her grandfather to give her mother the new house, she said she did not expect that, but added:    "We thought he intended to

pay her some way;" clearly meaning she and her mother thought so. By reading the evidence which was held adequate, in the cases we have cited, to prove an arrangement for payment, it will be seen there was ample evidence in this case.

The judgment is reversed and the cause remanded. All concur.