B. C. CHANDLER and MRS. B. C. CHANDLER v. G. L. HULEN, Executor of the Estate of DAVID M. HULEN, Appellant.—71 S. W. (2d) 752.

Division Two, May 17, 1934.

*Hulen & Walden* and *Pendleton & Martin* for appellant.

*Rubey M. Hulen, Edwin C. Orr* and *Roy D. Williams* for respondents.

COOLEY, C.—This cause originated in the Probate Court of Boone County, wherein plaintiffs filed demand against the estate of David M. Hulen, deceased, for board and lodging furnished and services rendered to said Hulen from June 8, 1914, until his death September 22, 1930. From an adverse judgment in the probate court defendant appealed to the Circuit Court of Boone County. That court, on defendant's application, ordered a change of venue to Cooper County where, upon trial to a jury, plaintiffs recovered

judgment for $8,700, the full amount of their claim. Defendant appealed. The only substantial controversy on this appeal is whether or not the evidence was sufficient to make a case for the jury, the defendant contending that it was not and that the court should have sustained his demurrers to the evidence and directed a verdict in his favor. Both sides by their instructions submitted the case on the theory that a family relation existed between plaintiffs and Mr. Hulen, casting upon plaintiffs the burden of producing evidence from which an agreement or mutual understanding that the services rendered were to be paid for can be found. The case is briefed here on that theory. We shall therefore assume that such relation existed. Plaintiffs' evidence tended to prove the following:

David M. Hulen was eighty-four or eighty-five years old when he died. He had been a farmer, living on a farm of two hundred acres which he owned near Hallsville in Boone County until he sold it to plaintiff, C. B. (Burl) Chandler. Plaintiffs were not related to him by blood but Burl had been reared by Mr. Hulen and his wife, who had no children of their own. He lived with the Hulens as a member of the family, but without being legally adopted, from about 1879 when he was four or five years old until he reached manhood and he and his coplaintiff were married. The date of their marriage is not shown. Mr. Hulen appears to have entertained strong affection for both the plaintiffs, which feeling they reciprocated. In 1912 Mr. Hulen, being old and infirm, desired to move to Centralia. Burl then owned a forty-acre tract nearby. Hulen asked Burl to sell the forty and buy his two hundred-acre farm, naming $16,000 as the price. C. W. Chandler, a brother of Burl, who heard part of the conversation, testified that Burl said it was too much and Mr. Hulen told him to go ahead and sell his forty "and if he (Hulen) could get enough off of it (the two hundred acres) to pay off a debt he owed and have a living out of it he would be satisfied." Within a few days Burl sold his forty and bought the Hulen two hundred acres, at the named price of $16,000. C. W. Chandler said that Burl paid in cash all the money he and his wife had but witness did not know the amount. Neither of the plaintiffs testified, being incompetent because of the death of Mr. Hulen. Burl gave Mr. Hulen his note for $10,000, secured by deed of trust on the two hundred acres. It seems Burl also gave Mr. Hulen a note for $3,500, unsecured, but whether at this time or later does not appear and it is not shown what became of that note. Mr. Hulen and his wife then moved to Centralia where they lived for about two years, when Mrs. Hulen died, the plaintiffs meanwhile living on the two hundred acre farm. Upon Mrs. Hulen's death Mr. Hulen came back to live with plaintiffs. That was about June 8, 1914, and from that time until his death, a little over sixteen years later, he lived with them. That is

the period covered by plaintiffs' claim. For some time, not definitely shown, they remained on the farm. Plaintiffs then moved to Hallsville, taking Mr. Hulen with them. During the period covered by the claim Mr. Hulen was badly crippled, having had one hand and one leg seriously injured. He could walk only by the aid of crutches or a crutch and a cane and his hands were "shaky," "palsied." He suffered from a kidney trouble resulting that during at least the latter part of the period covered by the claim he was unable to control his urine. He required much care and nursing, especially toward the last, which, with board and lodging, washing and mending, etc., were furnished him by plaintiffs. Upon moving to Hallsville plaintiffs added a room for Mr. Hulen to the house they there occupied because he could not go up and down stairs. Since no point is made in appellant's brief that the amount awarded by the jury is excessive or beyond the reasonable value of the services as shown by the evidence it is needless to state in detail the amount and character of the services rendered by plaintiffs. Suffice it to say the evidence is clear and undisputed that they ministered to Mr. Hulen's every need and want with all the kindness and affection that could have been expected had they been near to him in blood and that he fully appreciated their care and attentions. On numerous occasions during the sixteen years covered by plaintiffs' claim Mr. Hulen expressed his satisfaction with and appreciation of the care and services he was receiving from plaintiffs and his intention to compensate them.

George Chandler, another brother of Burl, testified that when Mr. Hulen was leaving the farm to go to Centralia, "I asked him what he expected to do for a living and he said he didn't have anything to do—that he was expecting his living from Burl."

Kenneth Chrisman testified that in 1917 he had a conversation with Mr. Hulen in which he said to the latter, referring to Burl's purchase of the farm and the note he had given: "He can't pay for that, can he?" To which Mr. Hulen replied: "I don't intend for him to pay for it. I want him to have it and when I'm gone I want everything to go to him, including this note."

Alfred Barnes testified that about 1925 this occurred: "I was trying to rent it (the farm) from him (Mr. Hulen) and I asked him what he was going to do with it and he said: 'I sold it to Burl,' and he told me what he got for it and I said: 'Burl may have a hard time paying for that,' and he said, 'I never expect him to pay for it; when I'm gone I expect him to have it all for taking care of me." "Yes, sir, he said he never expected him to pay for it; he said, 'If he takes care of me that's all I expect him to do, and it all goes to him.' "

J. P. McKenzie testified that about 1921 or 1922 Mr. Hulen "was

telling me about some work he had to do and I said: 'Uncle Dave, you have enough to do you the rest of your days, and he said: 'Well, I want some left; when I'm gone I want enough left to pay Mr. and Mrs. Chandler for their services to me.' ''

Mrs. Willard Rogers testified: ''Eight or nine years ago I was up spending the day with my daughter and Uncle Dave and Mr. and Mrs. Chandler came up and spent the afternoon and Uncle Dave was telling me about his sickness and he said: 'Mrs. Rogers, they are wonderful children to me and when I pass away I want them to have every dollar that I have.' ''Q. Did he say for what? A. For taking care of him.''

Frank Berkley testified that he heard Mr. Hulen say, about two years before his death, that ''if anything would happen to Burl he didn't know what would become of him.'' Mr. Hulen was then ''badly crippled,'' ''very nervous-palsied,'' and appeared anxious about Burl who was temporarily in a hospital receiving treatment for some ailment.

The $10,000 note shows credits of interest payments endorsed on the back thereof in each of the years 1913 to 1916 inclusive, and 1918, aggregating $5,357.90; a credit dated March 1, 1922, of $5000; a credit, dated January 31, 1928, of ''$100 for taxes advanced by B. C. Chandler;'' a credit of $100, dated December 9, 1929, and this endorsement, not dated but appearing between the credits dated February 17, 1925, for $100 interest and that dated January 31, 1928, for money advanced for taxes: ''Balance due on this note Mch. 1, 1926, $6200, and interest is hereby waived from Mch. 1, 1926, to the date of my death. (Signed) D. M. Hulen.''

R. B. Price, a banker with whom Mr. Hulen did business, testified that he made the last above-quoted endorsement at Mr. Hulen's request; also that at Hulen's request he endorsed the $5000 credit, and that so far as he knew there was no money paid at that time. For part but not all of the credits on the note, other than the $5000, corresponding deposits appeared in Mr. Hulen's bank book, the deposit entries in some instances having the notation: ''By Chandler.'' The $10,000 note, showing a balance due of $6000, was inventoried as part of Mr. Hulen's estate and was appraised at $4000. Defendant introduced another inventoried note, given by B. C. Chandler to David M. Hulen, for $2000, dated September 1, 1926.

Mr. Hulen left a will dated March 2, 1922, by which he directed that his debts be paid, set aside $100 for upkeep of his grave, gave a bedroom set to David Chandler, the balance of his household goods and twenty per cent of the residue of his estate to B. C. Chandler and distributed the balance among his relatives. Mrs. Chandler is not mentioned in the will. The inventory of the estate was introduced in evidence but is not set out in the abstract of record. It is stated

172

in respondents' brief that the estate consisted almost entirely of the two notes of B. C. Chandler, a statement not contradicted by appellant. The abstract of the record, however, leaves us in the dark as to the amount of the estate.

■ Where a family relation exists between the person rendering services such as here in question and the recipient thereof the rule followed in this State is that no promise or agreement that the services are to be paid for is implied from the mere fact that the services have been rendered and accepted. Prima facie, the presumption is that such services are rendered gratuitously, casting upon the party claiming compensation therefor the burden of rebutting such presumption. The claimant must prove that there was an agreement or mutual understanding that the services were to be remunerated, either by direct testimony or by evidence from which it may be inferred that there was a mutual understanding and intention to that effect. [Baker v. Lyell, 210 Mo. App. 230, 242 S. W. 703, 707, and cases cited.] But the agreement or understanding that the services are to be paid for need not be proved by direct testimony. It may be established by indirect evidence. [Cole v. Fitzgerald, 132 Mo. App. 17, 111 S. W. 628.] While mere expressions of gratitude or intended generosity on the part of the recipient are not alone sufficient (Woods v. Land, 30 Mo. App. 176), "the promise to pay may be implied from any facts or circumstances which in their nature justify the inference of an actual contract of hire or an actual understanding between the parties to that effect." Cowell v. Roberts, 79 Mo. 218, 221, quoted approvingly in Brown v. Holman, 292 Mo. 641, 650, 238 S. W. 1065, 1068, with the additional statement in Brown v. Holman that: "It is enough for the claimant to adduce evidence from which the jury might find that he and the deceased understood that the services rendered were not voluntary, but were to be remunerated."

In determining the question of whether or not there was such understanding it has been held that the nature and degree of the relationship and the circumstances of the parties as well as other matters which may affect it may be considered. [Hart v. Hess, Admr., 41 Mo. 441.]

■ In the instant case it can hardly be doubted that Mr. Hulen intended to compensate plaintiffs for their support and care of him. He repeatedly so expressed himself, using language indicating that what he intended was not merely to give them something as a gratuity but as compensation or payment. From the record it appears highly probable, if not certain, that the statement testified to by Mrs. Rogers, that when he passed away he wanted plaintiffs to have all that he had for taking care of him, was made in the presence of plaintiffs. Such declarations may be regarded not as mere expres-

sions of appreciation or gratitude but as indicating that he understood that plaintiffs were to be compensated and that he so intended. [Kingston v. Roberts, 175 Mo. App. 69, 79, 157 S. W. 1042; Broyles v. Byrne (Mo. App.), 13 S. W. (2d) 560, 561; Stone v. Troll, 134 Mo. App. 308, 311, 114 S. W. 82.] The deceased not only thus indicated that he intended to compensate plaintiffs but it is inferable from the evidence that some of his actions were influenced by such purpose. He said that he did not expect or intend that Burl should pay the $10,000 note, that all he expected from him was his living, etc., and as time progressed and it was apparent to him that plaintiffs were faithfully and cheerfully furnishing the support and services expected of them, credits were made on the note by Mr. Hulen or at his direction, some of which appear to have been voluntary.

As often happens in cases of this kind, the plaintiffs being precluded from testifying, the evidence of their intention to charge for the services and their understanding that they were to be paid therefor is not so clear. But we think such intention and understanding may legitimately be inferred from the facts and circumstances proved. When Mr. Hulen proposed to sell his farm to plaintiff Burl Chandler and the latter demurred on account of the price, Mr. Hulen urged him to go ahead, telling him that if he (Hulen) could get enough to pay a debt he owed and "have a living out of it," he would be satisfied. When he was leaving the farm he told a witness he did not have to do anything for a living, "he was expecting his living from Burl." If he *expected* his living from Burl it may be inferred that there was an understanding between them to that effect. When plaintiffs moved to Hallsville taking Mr. Hulen with them they added, at their own expense, a room to their house for his use and comfort. The services required of plaintiffs, especially during the later years of Mr. Hulen's life, were of an arduous nature. Plaintiffs were not related to Mr. Hulen by ties of blood and it does not appear that Mrs. Chandler had ever lived as a member of his family or that she and her coplaintiff had lived with the Hulens after plaintiff's marriage. While Burl so lived there, receiving care and nurture as a member of the family, he in turn did the work and performed the services customarily done by a boy in a farm home, thereby to some extent discharging the obligation he owed to his foster parents. Plaintiffs were not well off financially. They had nothing when they bought this farm but their interest therein, and long before Mr. Hulen's death it was of course apparent, in view of the well known depreciation of land values, that the value of that interest had dwindled to the vanishing point if they were held to payment of the price named in their deed. But they continued to render the services. Taking into consideration all of the facts and circumstances shown in the case and having in mind the

174

rule that on a demurrer to the evidence the plaintiffs are entitled to have the evidence favorable to them taken as true and to the benefit of such favorable inferences as may reasonably be drawn therefrom, we think plaintiffs made a case to go to the jury and that defendant's demurrers to the evidence were properly overruled. [See Hart v. Hess, Admr., supra; Cole v. Fitzgerald, supra; Stone v. Troll, supra; Baker v. Lyell, supra; Kingston v. Roberts, supra; Lillard v. Wilson, 178 Mo. 145, 77 S. W. 74; Smith v. Simms (Mo. App.), 258 S. W. 1032; Garner v. McKay (Mo. App.), 15 S. W. (2d) 908; Fry et ux. v. Fry, 119 Mo. App. 476, 94 S. W. 990; Broyles v. Byrne, supra.]

We have not overlooked the fact that in 1922, nearly eight years after the rendition of the services had begun, Mr. Hulen made the will above referred to. A similar situation existed in Thayer v. Palen, 224 Mo. App. 1088, 34 S. W. (2d) 536, in which recovery by the claimant was upheld but without discussion of the will. If a contractual obligation existed the making of the will could not defeat plaintiffs' right to recover. It might tend to throw some light on the question of Mr. Hulen's understanding as to such obligation. The evidence tends to show that after as well as before the making of the will he expressed his intention to compensate plaintiffs for taking care of him. The question was for the jury.

■ Appellant in his brief says the court erred in giving his Instruction No. 16 and in refusing his requested Instruction No. 14, the argument being that No. 14 should have been given instead of No. 16. Appellant made no complaint in his motion for new trial of the giving of Instruction No. 16. Moreover, having requested the instruction, thus inviting the error, if any, he is in no position to complain that the court erred in giving it. [Meffert v. Lawson, 315 Mo. 1091, 1098, 287 S. W. 610, 613.] We deem it unnecessary to set out the instructions. Defendant's given Instruction 16 is substantially the converse of plaintiffs' main instruction, A, of which no complaint is made on this appeal. Both placed upon plaintiffs the burden of proving an agreement or mutual understanding that the services were to be paid for. Defendant's Instruction No. 14 was unnecessary and it contains objectionable features that might have been misleading to the jury, which may have influenced the court's refusal to give it. Its refusal was not prejudicial error. The issues were sufficiently and fairly submitted by the instructions given. The judgment of the circuit court is affirmed. *Westhues* and *Fitzsimmons, CC.*, concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur, except *Ellison, P. J.*, absent.