MABLE I. WOOD, RESPONDENT, v. KANSAS CITY LIFE INSURANCE COMPANY, A CORPORATION, APPELLANT.—75 S. W. (2d) 412.

Springfield Court of Appeals.   October 2, 1934.

Rehearing denied, November 9, 1934.

*Frank W. McAllister, James W. Broadus* and *David W. Hill* for appellant.

*Tom R. Moore* and *Francis W. Kinder* for respondent.

SMITH, J.—This is an action based upon an alleged contract of insurance. On July 8, 1932, plaintiff's husband, Wesley W. Wood, made application for a policy of insurance with defendant Kansas City Life Insurance Company for the sum of $2,000. This application was for what is known as a ten-year convertible term policy with a double indemnity provision and on the non-medical plan. This application was taken by defendant's agent, Mr. T. N. Shields. At the same time Shields took this application from Mr. Wood he also wrote an application for a Mr. Alspaugh, who was Mr. Wood's foreman. Both Wood and Alspaugh were at that time employed at work on the highway. The applications were signed in the hotel at Ava, Missouri. Shields told Wood and Alspaugh when the policies came he would bring them over to Poplar Bluff and deliver both at the same time. Defendant asked for a medical examination of Mr. Alspaugh and sent to Shields blanks and the names of two doctors that he could go before at Poplar Bluff. Shields wrote to Alspaugh, sending him the blanks and giving him the names of the doctors. He waited a couple of weeks for Alspaugh's policy to come to him, and then wrote to Alspaugh again, saying he had not received a report on it. In the meantime, the policy written on Mr. Wood's life was received by Shields. While Shields was waiting for Alspaugh's policy he received a letter from defendant, stating Wood was in bed sick with typhoid fever.

At the time of signing the application herein involved Shields prepared, and Mr. Wood signed, three premium notes all dated July 8, 1932. These notes, Exhibits "D," "E" and "F" became due August 20th, September 20th and October 1st, respectively. Exhibit "D" was for the sum of $5.90, and Exhibits "E" and "F" for $8.85 each.

Some time prior to August 25, 1932, defendant wrote to Mr. Wood relative to the first note being due and on August 25, 1932, in reply thereto, plaintiff wrote from Poplar Bluff, Missouri, to defendant stating, "am very sorry to say but just haven't got the $5.90 as Mr. Wood has been in bed the last four weeks with typhoid fever."

The testimony of plaintiff was that her husband took sick the last two or three days of July, 1932. He had not been making any com-

plaint about not feeling well prior to that time. He remained in bed continuously from the latter part of July until the date of his death, which occurred on September 11, 1932. Dr. H. S. Clay of Poplar Bluff, Missouri, was called by plaintiff to treat her husband. Dr. Clay testified that he first saw Mr. Wood on July 31, 1932, and continued to treat him up until the date of his death. He was confined to his bed when examined by this physician on July 31st. On this day Dr. Clay ran a blood test on deceased and it showed he had typhoid fever; that for this test to have been accurate this disease must have been in existence nine days. Deceased's death resulted from perforation of the bowels, a complication of typhoid fever.

On October 7, 1932, defendant wrote from Kansas City, Missouri, to Mr. Wood at Poplar Bluff, stating that the premium notes were past due and asking that a remittance be sent or that Mr. Wood write stating what arrangement could be made about future payments. After receipt of this letter addressed to her deceased husband, plaintiff took it to Mr. Tom Moore, one of her attorneys in this suit. Mr. Moore testified that he advised plaintiff to send the money to defendant to pay the notes. Defendant received at Kansas City a letter from plaintiff which was not dated, stating: "In ans. to your letter of Oct. 7-32 I am sending money order to cover notes due $5.90—8-20-32; due $8.85—9-20-32; due $7.55 (Bal) 10-1-32, total $22.30. Please send policy No. 570-350 on life of Wesley W. Wood and notes to me at Walnut Shade, Mo."

On October 19, 1932, defendant wrote to plaintiff stating it had received the $22.50 covering the three notes of Wesley W. Wood, and "we enclose the cancelled notes, and are notifying our agent, T. N. Shields who will mail or deliver the policy to you in the near future."

On the same day defendant also wrote to its agent Shields, informing him that the notes had been paid and for him to deliver the policy immediately; that Wood's present address was Walnut Shade, Missouri. Shields testified that on the next morning after he received this letter he started from his home in Conway, Missouri, to deliver the policy to Mr. Wood. When he reached Walnut Shade he stopped at the post office and talked to a Mr. Weatherman. Making inquiry of Weatherman as to where he could find Mr. Wood he was told, "Well, you can't see him because he was buried right here—right out there in that little cemetery about ten days ago." Upon being told this, Shields returned to Conway with the policy. He testified that on the next day he wrote defendant that he had gone to Walnut Shade to deliver the policy to Mr. Wood and had found that he was dead. The letter Shields wrote to defendant was dated October 22nd. From this he fixed the date he was in Walnut Shade as October 21st, and stated that he had never been there before and had no knowledge prior to that date that Mr. Wood was dead.

Mr. Cecil Weatherman testified that plaintiff was his sister-in-law;

that Mr. Shields came to his store in Walnut Shade and asked where Mr. Wood lived and wanted to know how to get there and Weatherman said: "You can't see him, for he has been dead and buried about ten days. He is laying right out there in that little cemetery." He further testified that he had only seen Mr. Shields that one time and that he could not give the exact date as he did not give it much consideration. He stated it couldn't have been October 21st, because the grave hadn't settled yet. He also stated that he dictated the letter plaintiff sent enclosing the money order and was responsible for no date being placed upon it.

Mr. R. L. Fitzgerald testified he had charge of what was known as the Missouri Agency in the Home Office of defendant in Kansas City; that his office received notice of Mr. Wood's death from a letter Mr. Shields wrote October 22, 1932. That his office had no notice prior to that date of Mr. Wood's death and that his office merely passed Mr. Shields' letter on to defendant's legal department, advising that Mr. Wood was dead.

At the trial the policy of insurance was produced by defendant, it having been at all times in defendant's possession, or in the possession of T. N. Shields. Both the application and the policy provided the policy should not take effect unless it was delivered to the applicant while alive and in good health.

The premium, with interest thereon, amounting in all to $23.25, was tendered by defendant into court on June 28, 1933. The testimony further shows that Mr. Wood did not leave any will and that no letters of administration were taken out on his estate.

At the conclusion of plaintiff's evidence and again at the close of all the evidence, defendant offered a demurrer, which was overruled. The court gave three instructions on plaintiff's behalf and refused all instructions offered by defendant. The jury returned a verdict in plaintiff's favor for the face of the policy, together with a penalty of $200 and $500 attorney's fees, making a total of $2,700. After an unsuccessful motion for new trial, defendant perfected its appeal to this court.

The case is before us on four assignments of error, which we shall consider with such additional statement of facts as we may deem necessary. The assignments are as follows:

"1. The court erred in refusing defendant's demurrer at the close of plaintiff's case and at the conclusion of all the evidence.

"2. The court erred in refusing defendant's instruction No. 4.

"3. The court erred in refusing defendant's Instruction No. 6.

"4. The court erred in giving plaintiff's Instruction No. 3."

The first of these assignments has to do wtih the overruling of demurrers at the close of plaintiff's case and at the conclusion of all the evidence.

When the demurrer was overruled at the close of the plaintiff's

case, the defendant proceeded to introduce its testimony. It is a rule well established that a demurrer to evidence at close of plaintiff's case is waived if the defendant introduces evidence. [Friedman v. Maryland Casualty Co. (Mo. App.), 71 S. W. (2d) 491, 495; and cases there cited; Porter v. Equitable Life Assur. Soc., 71 S. W. (2d) 766, 772.]

It is also the rule that where defendant fails to stand on demurrer to evidence and introduces testimony plaintiff is entitled to most favorable inferences from all the evidence. [Sing v. St. L. S. F. Ry. Co. (Mo.), 30 S. W. (2d) 37; Story v. Peoples Motor Bus Co. (Mo.), 37 S. W. (2d) 898; Nicholson v. St. L. & S. F. Ry. Co. (Mo. App.), 51 S. W. (2d) 217; Sutton v. K. C. Star Co. (Mo. App.), 54 S. W. (2d) 454; Waller v. Tootle-Campbell D. G. Co. (Mo. App.), 59 S. W. (2d) 751; Chandler v. Hulen (Mo.), 71 S. W. (2d) 752, 756.]

It was conceded that the policy in this case was never delivered to the insured or to the plaintiff in this case. The evidence was conclusive that the application for the insurance was signed on the 8th day of July, 1932, and that three notes were signed on that date and delivered to the agent of the defendant and were by the agent of the defendant delivered to the defendant, and that these notes were for the first year's premium on the $2000 policy of insurance, and that this policy was sent by the defendant to its agent to be delivered to the insured. The evidence is also conclusive that the insured was sick in bed suffering with typhoid fever from July 31, 1932, to September 11, 1932, the date of his death. The premium notes were not paid until October following the death of the insured.

The application for the policy of insurance contained the following provision:

"If this application is not accompanied by the first premium in cash it is agreed that the company assumes no liability whatever until a policy of insurance is actually delivered to me during my. lifetime and while I am in good health, and any money, check, note, obligation or other thing of value, given to the company or its agent, on account of the first premium on the policy applied for shall be held by the company merely as a deposit and not as payment until such time as the policy of insurance is issued and delivered to me during my lifetime and while I am in good health, after which the same shall be applied on such first premium charge; otherwise said deposit shall be returned to me or my heirs, executors or administrators."

The policy also provided that:

"1. Unless the first premium has already been paid in cash, this policy shall not take effect until the first premium hereon has been paid and this policy delivered to the applicant within thirty days from the date hereof, and unless the applicant is in good health at the time of its delivery.

The question under the demurrer is whether or not there was sufficient competent evidence, together with the inferences to be drawn therefrom, to make it a question for the jury as to whether the defendant had waived the provisions of good health at the date of delivery of the policy and whether or not it waived the provision of delivery before liability attached. There is no question but that under the law of our State these provisions may be waived.

There is no doubt but that the question of waiver, generally, is one for the jury, and if there is substantial evidence on that question the verdict must stand.

The testimony shows these facts: On July 8, 1932, Wesley Wood made application for $2000 insurance, and gave his notes for the first annual premium; these notes were dated July 8, 1932, for $5.90 due August 20, 1932, $8.85 due September 20, 1932, and $8.85 due October 1, 1932. These notes were made payable to T. N. Shields and by Shields endorsed and delivered to the defendant. The application was accepted by the defendant and the policy issued on the 9th day of July, 1932, and was sometime later mailed to T. N. Shields to be delivered to the insured. The policy was mailed to Shields within the month of July. Shields held the policy waiting for another policy for another applicant so that they both could be delivered at the same time. On August 23, 1932, the defendant wrote Wood relative to the payment of his first note. On August 25, 1932, five days after the first note came due, the plaintiff in this case wrote the defendant stating, "am very sorry to say but just haven't got the $5.90 as Mr. Wood has been in bed the last four weeks with typhoid fever." When T. N. Shields was on the stand he testified:

"Then I got a letter from the Kansas City Life Insurance Company telling me they had wrote to Mr. Wood about his first note coming due, his first premium note, it was made in three notes, and telling me that Mr. Wood was in bed sick with typhoid fever and they were unable to pay for this insurance. So I yet didn't have Mr. Alspaugh's policy.

"Well, it was quite a little bit then before I heard any more about this policy until one day I received a letter from the Kansas City Life Insurance Company telling me they had received payment in full for all three of the Wesley Wood notes, and telling me to see that the policy was delivered immediately and that his present address was Walnut Shade, Missouri."

He also said that the next day after being advised to deliver the policy he went to Walnut Shade and learned then that Wood was dead and had been buried about ten days, and that he brought the policy back home with him.

Wesley W. Wood died on September 11, 1932, about two weeks after his wife had written the defendant that he was sick with typhoid fever.

On October 7, 1932, the defendant caused to be written Wood the following letter.

"Dear Mr. Wood:

"All three of the first year premium notes you signed for policy #570350, written by our agent, T, N. Shields, are now past due.

"The notes are as follows:

"$5.90 due 8-20-32

" 8.85 " 9-20-32

" 7.55 " 10- 1-32 Bal.

"Something should be done immediately about these past due obligations, and we will ask that you send us a remittance immediately or write us what arrangement you can make about future payments.

"Yours truly,

"THE MISSOURI AGENCY,

"(Signed) H. A. SCOFIELD,

Secretary."

"HAS:H

On cross-examination, T. N. Shields testified as follows:

"I prepared those notes and had Mr. Wood sign them. Those notes covered the premium of the policy he was buying with the double indemnity on it. It included the double indemnity premium as well as the usual fixed premium for the ten-year term policy, for one year's premium. I explained what double indemnity meant to Mr. Wood. I don't remember whether I explained to him that the company could extend that policy or change it at the end of the ten-year term. I told him that if the company didn't put the double indemnity on they 'wouldn't charge for it. They didn't put the double indemnity on the policy but he applied for it. That notation on the back of one of those notes 'Credit $1.30 D. I. (Double Indemnity), not included' means it was not included, but it should have been $2.60 off. That is a mistake. The credit was given because the double indemnity wasn't extended to him. I couldn't say at the time I received that policy it was my intention and the company's intention for me to make immediate delivery of it to Mr. Wood. They never do say anything about that when they send the policies to me. They send them to me and I usually try to get them delivered. They didn't give me any orders to deliver the policy and get the receipt signed. They didn't tell me what to do with the policy. There are no blanket instructions given to the agent as to what to do with the policies upon their receipt, they just send the policies to me without any instructions other than the policy and the receipt. I know what to do with the policies, of course. I accepted the three notes. The policy was in my hands, and naturally I expected to deliver the policy myself if I could, but sometimes we fail to deliver them. It is part of my work to make delivery of the policies that I write, but we don't always get them delivered. As far as I know, when I wrote

Mr. Wood he was in good health. I took his application for the policy in good faith and was not conspiring to hook the company when I took those notes. The whole thing was above board when I took his application. At the time I wrote Mr. Wood he wasn't weakly looking. He was a strong man. The company wrote me that they had received a letter from Mrs. Wood stating that Mr. Wood was unable to pay the first note because he was sick in bed with typhoid fever. The company asked me what I thought about sending the policy in for cancellation. They never sent any of the notes down to me to be delivered back to Mr. Wood or his wife. I never received them. I received notice from the company the following month after I took the application and the notes for the first premium that the notes had been paid. The company credited to my account my commission after the cash came in. I suppose they kept the money and paid me my part for writing the business. That is their usual procedure. I imagine I was credited with the full amount of the notes that day. Mr. Weatherman told me Mr. Wood had been buried about ten days when I was down there at Walnut Shade.''

Sometime after October 7, 1932, the plaintiff, Mable Wood, wrote the following undated letter:

''Kansas City Life Insurance Co.,
''3520 Broadway,
''Kansas City, Mo.
''Dear Sir:
''In ans to your letter of Oct 7-32 I am sending money order to cover notes

| ''due | $5.90 | 8-20-32 |
| '' '' | 8.85 | 9-20-32 |
| '' '' | 7.55 | Bal 10- 1-32 |
| '' | $22.30 | Total |

''Please send policy No. 570-350 on Life of Wesley W. Wood and notes to me at Walnut Shade, Mo.

''(Signed)    MABLE WOOD''

The plaintiff testified that after writing the above letter and sending the remittance, she received the cancelled notes with the following letter from the defendant:

''J. B. REYNOLDS   President
''KANSAS CITY LIFE INSURANCE COMPANY
''3520 Broadway
''Kansas City, Missouri
''October 19, 1932

''The Missouri Agency
''R. L. Fitzgerald, Supervisor
''H. A. Scofield, secretary
''Mrs. Mable Wood,
''Walnut Shade, Missouri.

"Dear Mrs. Wood:.

"We thank you for your remittance of $22.50, covering the three notes of Wesley W. Wood, as follows:

"$5.90 Due 8-20-32
" 8.85 " 9-20-32
" 7.55 " 10- 1-32 Bal.

"We enclose the cancelled notes, and are notifying our agent, T. N. Shields, who will mail or deliver the policy to you in the near future.

"Yours truly,
"(Signed) The Missouri Agency
"F. Hill"

The policy was never mailed or delivered to the plaintiff. The remittance was not returned by the defendant to Mrs. Wood. On October 19, 1932, defendant wrote its agent T. N. Shields the following letter:

"October 19, 1932

"Mr. T. N. Shields,
"Conway, Missouri.
"Dear Mr. Shields:

"We have received remittance on the three notes of Wesley W. Wood as follows:

"$5.90 Due 8-20-32
" 8.85 " 9-20-32
" 7.55 " 10- 1-32 Bal.

"We have mailed the cancelled notes to them. Please see that they receive their policy promptly. Their address now is Walnut Shade, Missouri.

"Yours truly,
"H.                        The Missouri Agency"

R. W. Fitzgerald testified as follows:

"I live in Kansas City and I am supervisor of the Missouri Agency for the Kansas City Life Insurance Company. I formerly lived in Poplar Bluff. I have charge of what is known as the Missouri Agency in the Home Office of the Company in Kansas City. That initial 'H' on these letter exhibits refers to Miss Hill, one of the stenographers. She was in our office in 1932, but is not right now. She acted under my supervision. We received notice of the death of Wesley W. Wood from a letter from Mr. Shields that he wrote October 22, 1932. My office did not have any notice of Mr. Wood's death prior to October 22, 1932. It was through my office that this information came to the main office in Kansas City, relative to this policy. The first notice we had of Mr. Wood's death was the letter we received from Mr. Shields the following day after he went to Walnut Shade.

"CROSS-EXAMINATION

"Frank W. McAllister is general counsel for the Kansas City Life Insurance Company. He represents the company as their attorney. The first notice we had of Mr. Wood's death was the letter from Mr. Shields, dated October 22, 1932, which we in turn passed on to the legal department. By 'we' I mean the Missouri Agency. We merely passed Mr. Shields' letter on to the legal department advising them that he was dead. That letter received from Mrs. Wood about August 25th advising that Mr. Wood was in bed sick with typhoid fever and had been for four weeks was just received in the general correspondence. I don't know whether it was passed on to anyone at that particular time or not. I do not remember the particular instance, but am just testifying the way the routine of the office goes. The medical department would have to construe whether when a person is confined in bed for four weeks with typhoid fever is a serious proposition or not. At the time we wrote the letter of October 7th we didn't know he was dead. We never had been advised that he was dead.

"RE-DIRECT EXAMINATION

"We had no knowledge of any administration. We investigated it.

"RE-CROSS-EXAMINATION

"The investigation of that was made here today. Our records show Mrs. Wood sent this money in. She wrote us a letter and signed it.

"Q. Why didn't you send the money back to her at the time you say your agent, Mr. Shields, notified you that Mr. Wood was dead? A. That at that time was in the legal department. We turned that letter over to them.

"Q. It was up to General McAllister to do it, was it? A. Yes."

The receipt of the Circuit Clerk of Butler County shows that this premium money was paid to him as tender of return premium on June 28, 1933.

As shown by T. N. Shields' testimony, quoted above, "The company wrote me that they had received a letter from Mrs. Wood stating that Mr. Wood was unable to pay the first note because he was sick in bed with typhoid fever. The company asked me what I thought about sending the policy in for cancellation."

It is our conclusion that the facts as herein set out at length was at least sufficient to make it a question for the jury as to whether or not the defendant waived the provisions in the application and in the policy (said provisions hereinbefore quoted) with reference to the application not being accompanied by cash, and also with reference to the applicant not being in good health. The evidence

is convincing that the defendant accepted the notes and issued and ordered delivered the policy before the notes were paid.

The evidence also shows that the defendant relied on its agent Shields with reference to the policy, for the evidence shows it asked Shields' advice about cancelling the policy on account of sickness of the applicant. We think the evidence was at least sufficient to make the question of waiver of the provisions pertaining to good health one for the jury.

The question of waiver of the death of the applicant for the insurance before delivering the policy has not been so easily determined. We are not unmindful of the law as construed by the courts that a dead man cannot be insured, but in this instance we have some things that are established by proof, and some others that may be inferred. Here we have an agent authorized to take applications for insurance, and to deliver policies, and to take notes for the first annual premium. These notes were made payable to himself and endorsed by him to the defendant. It might well be inferred that this endorsement strengthened the notes and because of such the defendant waived the stipulation in the application and in the policy, and accepted the notes as payment of the premium, and sent the policy to the agent, to be delivered. The inferences are that the defendant considered the notes good as cash, and considered the contract closed. After the first note became due demand was made upon the applicant for payment; within a short time after demand the plaintiff wrote the defendant that she did not have the $5.90 with which to pay the note, and in addition told the defendant her husband had been sick with typhoid fever for about four weeks. Following that notice of ill health, the defendant wrote to its agent and advised him of the report of sickness, and asked him for advice with reference to cancellation of the policy on account of the applicant's sickness. The record is silent as to the advice the agent gave them, but at any rate the defendant kept the notes, did not attempt further to cancel the policy, but attempted to and did collect the notes after it had information that the insured had suffered with typhoid fever from shortly after the issuance of the policy. Are these circumstances competent for the jury to consider on the question of waiving delivery before the death of the insured? We think so when considered along with other evidence and circumstances in the case. Bear in mind that it was before the jury as to the taking of the notes and the endorsement thereof, with the mailing of the policy to the agent, together with the testimony showing the defendant's seeking the advice of its agent, and with the inference at least that he did not advise cancellation on account of sickness. After this information of sickness was received the defendant kept the notes and later collected them, and kept the money for sometime.

The plaintiff's testimony showed that the insured died on Sep-

990

tember 11, 1932, and while the defendant's testimony showed that it had no knowledge of the death until October 22, and the agent said he had no knowledge of the death until October 21, yet this is contradicted by the testimony of the plaintiff. A witness for the plaintiff said that Shields came to his store looking for the insured. He said this was a week or ten days after the death of Wood. On cross-examination he said "Well, I couldn't tell you the exact date to save my life, that Mr. Shields came up there to my place, but I remember making the remark to Mr. Shields when he came up there that Mr. Wood had been dead a week or ten days." In another part of his testimony he is quoted as saying, "It couldn't have been October 21st that I talked to Mr. Shields, it couldn't have been that far off at all, because the grave hadn't settled yet and it had only been a little while since he was buried. I have got enough dates in my mind that I know it hadn't been a month since he died. It was just a short time after he died, because the girl had just got moved over with her folks and I know it was just a few days after he died. I wouldn't know the exact date, but I know it was less than any month after he died. I didn't keep any record of the date. October 21st is too long."

"Q. Can you tell the jury whether or not it was in September or October? A. I would say it was September, because it was just a short time after the boy's funeral. It appeals to me that it wasn't many days after his funeral, but I wouldn't attempt to say what date it was because those things slip away from a fellow besides, and I was busy and I didn't give it any particular attention as to the date at the time. But I would contend that it was some time in September."

Taking the above testimony, it shows that Shields had knowledge of the death around the 21st of September, or at least it was sufficient testimony to make it a question for the jury as to when he received the information. He testified it was October 21st that he received the information.

If he received the information on September 21st, he held the policy until October 22nd before writing to the company of the death. But he did write on October 22nd, and the defendant did not see fit to return the premium that it had collected on or before October 19th. On that date it wrote Mrs. Wood that the premium had been received from her and sent her the cancelled notes. The defendant kept the cash with no offer to return it until it was paid to the circuit clerk on June 28, 1933, after suit had been filed.

We think these are circumstances to be submitted to the jury on the theory that the defendant considered the policy in force and effect and that it considered the contract as completed. It is not our province to say that the evidence was sufficient. It is only for us to determine whether or not there was sufficient evidence with the

inferences to be drawn therefrom to go to the jury. It is our conclusion that the trial court did not commit error in refusing the demurrer at the close of the whole case. We think we are sustained in this conclusion by the following cases: Carpenter v. St. Joseph Life Ins. Co., 212 Mo. App. 336, 342, 246 S. W. 623; Rhodus v. Kansas City Life Ins. Co., 156 Mo. App. 281, 285, 137 S. W. 907; Bohannon v. Ill. Bankers Life Ass'n, 223 Mo. App. 877, 881, and cases there cited, 20 S. W. (2d) 950; National Bank of St. L. v. Mo. State Life Ins. Co., 57 S. W. (2d) 1066, 332 Mo. 182, 193, and cases cited; Daniel v. Aetna Life Ins. Co. (Mo. App.), 36 S. W. (2d) 689; Farrell v. Kroger Grocer & Baking Co. (Mo. App.), 71 S. W. (2d) 1076, 1077, and cases there cited.

The defendant contends that it cannot be held liable under this contract for not returning the premium, contending that the proper person to whom tender should be made is the personal representative of the insured and not the beneficiary, and relies on the case of State ex rel. v. Trimble, 292 Mo. 371, 239 S. W. 467.

We have no fault to find with the opinion in the above case, but the facts in that case are entirely different from the facts here. There it was a matter of the right to make a defense on account of misrepresentations because the premiums had not been returned. Here it is not a question of the right to make a defense; it is a question of the circumstances growing out of retaining the premiums. In that case the premiums were paid by the insured; here the premiums were paid by the beneficiary and the payment from her was acknowledged, and the notes sent to her. So we hold that since the money was received from the beneficiary and so acknowledged by the defendant, there is nothing to the point that there was no administrator or executor of the insured's estate to whom tender could have been made.

In addition to the Trimble case, supra, the defendant relies on the following cases to sustain its contention that the court erred in refusing to direct a verdict for the defendant: Erickson v. Missouri State Life Insurance Co., 256 S. W. 108; Yount v. Prudential Life Ins. Co., 179 S. W. 749; Benson v. Metropolitan Life Ins. Co., 161 Mo. App. 480, 144 S. W. 122; Misselhorn v. Life Assn., 30 Mo. App. 589; Carpenter v. St. Joseph Life Ins. Co., 246 S. W. 623, 212 Mo. App. 336; State ex rel. v. Shain, 66 S. W. (2d) 871.

We have read each of the cases above cited by defendant, and we think that under the facts in this case the above cases are not in point and do not sustain the defendant's contention. On the contrary we think the Carpenter case, supra, does hold that the insurer may so conduct itself as to indicate that it has treated the contract as existing.

The defendant complains of error in refusing to give its requested Instruction No. 4, which is as follows:

"The court instructs the jury that if you believe from the evidence in this cause that the insurance policy in evidence had never been delivered to Wesley Wood in his lifetime and that the premium notes were not paid until after his death, and that the defendant, at the time it accepted payment for the premium notes, had no knowledge of the death of Wesley Wood, and that there was no administration of Wesley Wood's estate, and that the defendant paid over to the clerk of this court, June 28, 1933, the amount received by the defendant in payment of the premium notes, then your verdict must be for the defendant."

We hold that it was not error to refuse the above instruction because it did not embody the question of waiver hereinbefore discussed by us in that it left out the retaining of the notes and the retaining the cash an unreasonable time after receiving notice of death.

Defendant also complains of error in refusing its requested Instruction No. 6. This instruction is as follows:

"The court instructs the jury that if the applicant, Wesley Wood signed an application for an insurance policy with double indemnity provisions, and that the defendant refused to issue that kind of a policy and did issue a policy without double indemnity provisions, and forwarded it to the defendant's agent for delivery to Wesley Wood and that the said Wesley Wood never approved that policy in his lifetime, and that the defendant's agent did not deliver the policy to Wesley Wood, and the defendant accepted the payment for the premium notes without any knowledge of the death of Wesley Wood, and that the defendant paid to the clerk of this court the amount received by the defendant for the premium notes, then your verdict must be for the defendant."

In complaining about the refusal of this instruction the defendant says:

"This instruction is based upon the evidence, which was that Wesley Wood applied for a policy of insurance containing a double indemnity provision in the event of accidental death. The application for a policy in the form applied for by him was not approved by appellant. If the jury found these facts to be true, coupled with the other fact that the policy actually written was never delivered to Wood and therefore never accepted by him, then there was no meeting of the minds of the contracting parties and therefore no contract."

We think there is no merit to this contention for when defendant's agent was on the stand he, without the least contradiction testified with reference to the double indemnity contract as follows:

"I prepared those notes and had Mr. Wood sign them. Those notes covered the premium of the policy he was buying with the double indemnity on it. It included the double indemnity premium as well as the usual fixed premium for the ten-year term policy, for one year's premium. I explained what double indemnity meant to

Mr. Wood. I don't remember whether I explained to him that the company could extend that policy or change it at the end of the ten-year term. I told him that if the company didn't put the double indemnity on they wouldn't charge for it. They didn't put the double indemnity on the policy but he applied for it. That notation on the back of one of those notes 'Credit $1.30 D. I. (Double Indemnity), not included' means it was not included, but it should have been $2.60 off. That is a mistake. The credit was given because the double indemnity wasn't extended to him.''

It is clear from the above testimony that the insured applied for the insurance either with or without the double indemnity provision, and that the defendant so understood and accepted the application.

Defendant's final complaint is in giving plaintiff's Innstruction No. 3, which is as follows:

''The court instructs the jury that if you find for the plaintiff in this case, and further find and believe from the evidence, that the defendant retained the premium on the insurance policy in suit, and at the same time was pretending to the plaintiff and claiming that the policy was never in force, and further find that the defendant vexatiously refused to pay same, then in addition to the amount of the policy of $2000 you may also allow plaintiff for such vexatious refusal to pay if any, such sum as you may deem proper, not to exceed the sum of ten per cent of the face of the policy and in addition thereto if you find the refusal to pay has been vexatious and that plaintiff was compelled to employee counsel to institute and prosecute her suit, you may allow plaintiff such sum as attorney fees as you may deem proper.''

We think there is merit to this contention. We have herein set out at great length the facts in this case, and it is rather a close case, and so much so that we feel the trial court should not have given the instruction as to penalty occasioned by a vexatious delay in payment. We think we are sustained in this conclusion by the following cases, well in point. [State ex rel. v. Allen et al., 303 Mo. 608, 620, 262 S. W. 43; State ex rel. v. Shain et al. (Mo.), 66 S. W. (2d) 871, 876.]

It follows that this judgment should be affirmed, if within ten days from the date of this opinion, the plaintiff enters a written *remittitur* of the amount of $200 damages for vexatious delay and $500 as attorney fee for vexatious refusal to pay. Upon a *remittitur* of these items the judgment should be affirmed; otherwise the judgment should be reversed and the cause remanded for a new trial. It is so ordered. *Allen, P. J.,* and *Bailey, J.,* concur.