**T. F. ALLMON, Plaintiff-Appellant,**

v.

**Rufus N. ALLMON, Administrator of Estate of Joe Allmon, Deceased, Defendant-Respondent.**

No. 7680.

Springfield Court of Appeals. Missouri.

June 7, 1958.

Esco V. Kell, West Plains, Weldon W. Moore, Rolla, for plaintiff-appellant.

J. Ben Searcy, Eminence, Green & Green, Will H. D. Green, H. D. Green, West Plains, for defendant-respondent.

RUARK, Judge.

By this appeal claimant-plaintiff seeks to regain a verdict taken from him by the trial court.

T. S. (Tom) Allmon filed claim against the estate of Joe Allmon in the residence county of Oregon.[1] Ultimately the case was tried in the Circuit Court of Phelps County. Claimant gave instruction P–1, wherein he submitted as items of recovery "any room, living quarters, meals, board *and special trips and other trips."* The jury returned a verdict in favor of claimant for $3,500. Thereafter the court sustained the defendant-administrator-respondent's motion for new trial for the stated reasons (a) plaintiff did not make a submissible case and (b) instruction P–1 submitted issues broader than and beyond the demand.

In determining whether claimant made a submissible case it is necessary for us to review the evidence. In so doing it is fundamental that we must consider and accept as true all evidence which is favorable to the verdict and we must cast aside all evidence which is to the contrary; and we consider all favorable inferences which the jury might reasonably have drawn, even though it be that the jury could have reasonably drawn a contrary inference.[2] We relate then only that part of the evidence which we believe might be taken as favorable to the plaintiff.

The claim was for things of value rendered to Joe Allmon. In order to avoid possible confusion in a number of names involved (and also to avoid that impersonal and terribly final term "the deceased"), we will take from the transcript the more affectionate name, "Grandpa." This man, who had "farmed and worked hard all his life," lived on a "good" farm in the vicinity of New Liberty in Oregon County. There he reared his family. How many children he fathered the record does not show, but we find reference to sons Tom (the claimant), Rufus, Oscar, Jim, and Louie. By the time the situation we are concerned with arose, all the children were grown and gone, although claimant and three of the other sons lived somewhere in the general neighborhood. Son Tom ran a store at New Liberty and Oscar lived not far

1. Such claim is:
"Now comes claimant in the above entitled cause and for his amended demand against the estate of Joe Allmon, deceased, states as follows:
"1. That he, the above named claimant, furnished at the special instance and request of Joe Allmon, deceased, during the life time of said deceased, Room, Living quarters, Meals, Board, Special trips to doctors and vacations and other trips for the comfort and convenience of the said Joe Allmon and that said living ·quarter(s), room, Board and meals were furnished at the rate of Sixty ($60.00) dollars per month and that at the time the sum of Sixty dollars per month was proper and reasonable charge therefor; that all of said room, board, meals and trips were furnished by claimant to said

Joe Allmon from the —— day of ——, 1947, to the 29th day of March, 1954.
"2. That said Joe Allmon promised and agreed to pay same and every part thereof; that the total amount for said room, board, living quarters and meals for said period of time is Five Thousand and Forty ($5040.00) dollars.
"3. That said Joe Allmon made some partial payments on the above mentioned claim in the sum of $—— and that there remains due and unpaid the sum of Five Thousand and Forty ($5040.00).
"Wherefore claimant prays judgment against R. N. Allmon, Administrator of the Estate of Joe Allmon, Deceased, for said sum of $5040.00."
2. McDaniel v. McDaniel, Mo., 305 S.W.2d 461.

away; son Rufus ran a store at Winona, a nearby town, and Jim lived in that neighborhood. The old gentleman must have been a man of some substance, for the record shows that he loaned one of his sons (not claimant) $25,000 and "had money in the bank."

In 1945 Grandpa's wife died. In 1947, when he was eighty-one years of age, it appears that he sold his farm and cast about for a place to stay. "He planned to visit with all the kids." And it further appears that he went to, or at least investigated the possibility of living with, others of his sons, found it not to his liking, and went to claimant Tom's. While Grandpa did not want to live where he had to "bach," he wanted his sleeping facilities so that he could be alone, because the children and the noise bothered him. Located upon Tom's messuage were a home where Tom's family lived, a store building, and a cabin or cottage. When Grandpa came, this cabin was renovated. "They completely over-hauled the inside, the ceiling and walls and the flooring put in new, and painted it and put brick siding on the outside." Grandpa moved in with the family until the cabin was finished and then used the cabin as his private sleeping quarters. He continued, however, during the period of seven years and until he died in March, 1954, at the age of eighty-seven years, to eat his meals at Tom's family table. There were a few times during that period when "he got mad at us and left" for short intervals. And there were some times that he would take pouting spells and refuse to come out of his cabin and eat. On those occasions claimant, or claimant's wife, would take his meals and "would just set them outside the door. Sometimes he'd come get them; sometimes he wouldn't."

When Grandpa came to Tom's he was possessed of considerable physical and mental vigor for a man of his age. He helped about the place, did odd jobs and chores, worked some in the garden, and clerked in the store upon some occasions. Until 1950 there was a nearby sawmill which was owned by Tom and one of Tom's sons, and Grandpa helped some around that sawmill. One of the defendant's trial theories was that Grandpa had paid, or at least partly paid, his way by contributing work, especially at that sawmill. Various witnesses testified to occasions upon which they had seen him working as a handy man around the mill, piling boards, "doodling" sawdust, rolling logs, et cetera. On the other hand, claimant's evidence would indicate that Grandpa was more in the way than he helped; that he "pottered around." In the language of claimant's wife, "He didn't do any of that by us a-wanting him to. He did help. We didn't ask him to. And we tried to keep him from working. Heavy work and hard work hurt him; he was too old." In the more expressive words of one of claimant's sons, " * * * he'd come down and help, piddling around. He never made no hand at no time." According to claimant's evidence, he didn't want Grandpa around the mill for fear that he would get hurt; that he would tell Grandpa that and Grandpa would go off and pout about it, and this was one of the reasons the mill was moved (in 1950) to Oscar's place. Once after the mill was moved Grandpa came there to work and was told he wasn't wanted around the mill. "It made him mad," but he didn't come back anymore.

As to whether there was a mutual understanding that there would be payment: Gerald Allmon, son of claimant, testified to occasions when Grandpa would come in the store and buy some flour, sugar, or lard and make such statements as, "This will kinda help pay my way," or "This will kinda pay my way." He always asked for and got a receipt for these purchases. (Of these receipts more later.)

"Q. Now was you ever—was your father, Tom, ever present when these statements would be made? A. Yes.

He was the one would be getting them for him most of the time, and he'd make him a bill for it and give it to him."

Milton Allmon, another son of claimant's, testified he heard his grandfather make the statement "a good many times" to the effect that he didn't expect anybody to keep him for nothing and he was trying to pay part of his way. This witness made some of the purchase tickets for his grandfather.

Mary Allmon, wife of claimant, testified:

"Q. Now have you ever heard him make any statements about paying for his keep there, or his board and room and—A. Yes. He always said that he expected to pay; that he didn't want us to keep him for nothing and he wanted to pay."

This witness testified that Grandpa paid her $10 per year "for the wash"; and after he had been there about three years " * * * he got then where he'd bring over a few groceries," meal and flour and sugar and lard. Finally "he kept bringing groceries in and I'd have plenty, and I told him then if he wanted to, just deposit the $8 on there and if there's anything extra he wanted, bring it over."

Louis Mack, a neighbor who visited with Grandpa and said he had et with him some, heard him say that he expected to pay his way; he didn't want to be a burden on anybody.

Paschal "Gale" Patrick, a neighbor, testified that about a couple of years before he died Grandpa told him he had paid $120 on his keep.

Defendant's witness Jim Allmon testified that his father in the last few months of his life said that "he was a-paying his way everywhere he went."

Defendant's witness Roy Douglas, a neighbor, testified that one time *in 1952* "when I was taking him over to Jim Allmon's, when he was leaving Tom's up there to go over to stay with him for awhile, he told me that he felt like he paid for every accommodation he ever got there."

Introduced in evidence were twelve tickets which had been issued to Joe Allmon for groceries, each in the exact amount of $8, most of which are marked paid and some of which are initialed by the claimant. These receipts are of irregular dates, some of which are hard to make out. Two of them appear to be dated in 1950, but we are not certain; one or two of them are year 1952 or 1953; five of them are definitely in 1953; and one is definitely 1954. As to the remaining two we cannot say.

■ The family relationship having existed, it is the presumption that the board and sleeping quarters were furnished gratuitously. This presumption of course is not conclusive. It only casts upon the claimant the burden of proving an agreement or understanding between the parties that the things furnished were to be paid for; and although it is held that the proof to overcome such presumption and establish the agreement must be clear and convincing, it is almost trite to say that such mutual understanding need not necessarily be proved by direct evidence of a specific contract, but may be made by showing facts and circumstances from which it may reasonably be inferred that the things furnished were not voluntary and gratuitous, but there was an understanding between the parties that they were to be paid for.[3]

■ As to *what* facts and circumstances will justify the inference, each case of course must stand upon its own. But the courts have recognized the handicap imposed upon the claimant by his dis-

---

3. In Vosburg v. Smith, Mo.App., 272 S.W. 2d 297, loc. cit. 301, Judge Stone painstakingly gathered and classified the cases which are authority for these statements. See also McDaniel v. McDaniel, Mo., 305 S.W.2d 461.

ability under the dead man's statute, where the intention to charge is "not so clear," [4] and have permitted a rather far-flung net to encircle and seine in all circumstances which attend the situation of the parties at the time of the transactions and occurrences. Sometimes the very character of the work performed when taken with the situation of the parties is a healthy factor to be considered.[5] And the financial status of the deceased and his ability to pay are not to be overlooked,[6] for "it would be unreasonable to conclude from all this uncontradicted evidence that the services of such a character, extending over such a long period of time, rendered by one child with no participation by the deceased's other children therein, so far as the record shows, should be regarded as gratuitous because of the family relation between plaintiff and her father." Liebaart v. Hoehle's Estate, Mo.App., 111 S.W.2d 925, loc. cit. 930.

■ In this case we believe that a jury, taking into consideration the whole circumstances, including the financial ability of the deceased, together with the facts concerning the other children, the statements made by deceased to members of claimant's family and other persons, the occasional purchase of groceries and the demand for receipt therefor, could have reasonably inferred that deceased intended to pay, and claimant expected to be paid, the reasonable value of his board and room. That the parties might have disagreed as to what that reasonable value was, or whether deceased, in his own mind, had determined that he had paid all he should,

were matters concerning which the jury might also have made inference; but the jury's decision, being based on reasonable inference, is the supreme law of the facts, and we are bound to give it complete homage.

But respondent contends there was no competent proof concerning the value of the board and room. Plaintiff called two witnesses, both from West Plains, in Howell County, adjoining Oregon County. (Both counties abut upon the Arkansas line and enjoy the benefit of being part of the Missouri Ozarks.) Both of these ladies operated rest homes. One of them testified that "nearly everywhere the prices are all about the same," and put the value of board and keep at $50 to $60. The other witness, who has "several people from Oregon County," put the charge at from $50 up to $75 (where the customers had private rooms). It is argued that the testimony of these witnesses from Howell County was of no probative value in determining the reasonable value of board and room in adjoining Oregon County.

■ The qualification of expert witnesses lies within the sound discretion of the trial court,[7] and, the evidence having been admitted, we cannot say that it was wholly without probative value.

■ Furthermore, while it is the general rule that in a *quantum meruit* action there must be evidence of the reasonable value of the thing furnished, where the value of such is susceptible of proof by testimony and it requires special knowledge or professional skill,[8] it is also true that

4. Broyles v. Byrne, Mo.App., 13 S.W.2d 560; Chandler v. Hulen, 335 Mo. 167, 71 S.W.2d 752; see Been v. Jolly, Mo., 247 S.W.2d 840, 854; Vosburg v. Smith, Mo. App., 272 S.W.2d 297.

5. Brown v. Holman, 292 Mo. 641, 238 S.W. 1065, 1038.

6. Cole v. Fitzgerald, 132 Mo.App. 17, 111 S.W. 628, 631; Liebaart v. Hoehle's Estate, Mo.App., 111 S.W.2d 925, 930.

7. Christian v. Jeter, Mo., 287 S.W.2d 768; Minor v. Lillard, Mo., 306 S.W.2d 541;

Baker v. Brown's Estate, 365 Mo. 1159, 294 S.W.2d 22; In re Stein's Estate, Mo. App., 177 S.W.2d 678.

8. 98 C.J.S. Work and Labor § 57, p. 807; Tuttle v. Brayton, Mo.App., 215 S.W. 2d 46; Boggess v. Cunningham's Estate, Mo.App., 207 S.W.2d 814; Id., Mo.App., 240 S.W.2d 721; Gillen v. Haley, 185 Mo.App. 23, 171 S.W. 638; Elstroth v. Karrenbrock, Mo.App., 285 S.W. 525; Dobbin v. Dobbin, Mo.App., 204 S.W. 918.

when the value is a matter of common knowledge the trier of the fact may determine the reasonable value from his own knowledge without the aid of opinion evidence.[9] The items here involved were room and board. "If there is anything in life that is a matter of common knowledge it is the cost of food." Hensley v. Dorr, Mo.App., 202 S.W.2d 553, 559. Taking the testimony of the two nursing home operators *in combination* with the knowledge which the jurors had concerning the cost of room and board, we cannot say that the verdict must fail for lack of evidence of value, and we think appellant made a submissible case in that regard.

But as to the "trips and special trips" submitted as items of recovery in instruction P–1, we have a different view. Passing without deciding the question of whether the claim could be interpreted as asking compensation for such trips, and, therefore, whether the instruction is broader than the claim, we accept appellant's theory that the parties voluntarily tried the issue as though it had been pleaded and therefore could not thereafter complain.[10] We examine the evidence.

Claimant's wife testified that Grandpa asked claimant to take him on business trips to West Plains "different times" and to Winona "a few times," and it "seems like he took him to a doctor one time." *How many* trips to West Plains or Winona is not even approximated, nor is it apparent whether claimant made special trips solely for the purpose of taking his father or whether he simply took Grandpa with him on occasions when he was going anyway, nor how much time of claimant was occupied in making these trips. Nor is there any evidence whatsoever as to the reasonable value of the uncertain number of trips which were taken.

A "special trip" mentioned in the instruction we assume to be that which the family made to the West Coast. Claimant, his wife (whether other members of their family went along is not clear), and Grandpa went. Who first broached the subject of such trip is not shown. All that appears from the evidence is that Grandpa said he wanted to go, "that he'd sure like to go," and claimant took him along. The party went first to New Mexico, where they visited one of Grandpa's sons (claimant's brother), then to Oregon to visit with claimant's son and with claimant's wife's sister. Thence they went into the State of Washington, where they visited Grandpa's brother and sister.

According to claimant's evidence the trip cost claimant "some over" $400, and Grandpa paid claimant $60 of that expense shortly after they came back. How much, if any, Grandpa spent on the trip along the way the plaintiff's evidence does not show. Defendant's witnesses testified that Grandpa told them he'd spent over $300 on the trip.

The evidence does not justify a reasonable inference that this trip was planned or made at the request of Grandpa with the mutual understanding that he was to pay for it. Rather, it seems clear that that it was simply a family venture in which each participated and received benefit. Nor is there evidence from which the jury could have found the reasonable value of the service claimed. The amount the family *spends* for its vacation would be no criterion of the reasonable value of the trip, for vacations are notorious for unnecessary and light-hearted extravagances, even unto the mailing of comic post cards to the folks back home. The measure of recovery in *quantum meruit* is the reason-

9. Ashley v. Williams, 365 Mo. 286, 281 S.W.2d 875; In re Hartle's Estate, Mo. App., 236 S.W.2d 40; Schraedel v. St. Louis Public Service Company, Mo.App., 248 S.W.2d 25.

10. Sec. 509.500 RSMo 1949, V.A.M.S.; Raymond, Missouri Instructions to Juries, vol. 1, sec. 91, p. 73; Doutt v. Watson, Mo.App., 231 S.W.2d 230, 233; Jennings v. Kinealy, Mo.App., 40 S.W.2d 513;

able value and not what is actually expended. While the amount so expended may be considered, it must be accompanied or followed by evidence that such amount was reasonable or necessary.[11] If an instruction submits items for recovery not supported by the evidence and calculated to mislead the jury, it is fatal error to give it.[12]

Appellant seeks to avoid the weakness in his submission as to trips and special trips by arguing that they should simply be treated as matters of no consequence, and to that he cites Love v. Richardson, Mo.App., 61 S.W.2d 220. That case is distinguishable. There the claim was for nursing and caring for deceased, there was no testimony as to the value of food furnished, and the court said, loc. cit. 224, that the substantial item that made up the claim was for nursing services and that the value of the food furnished was "treated of no consequence." But we cannot disregard the submission of the trips as of no consequence. There was evidence concerning the cost of the special trip, and the jury may well have based a part of their award on such. There is no way the inclusion of these items as a basis of recovery can be cured by remittitur, and for such reason we think the court was correct in sustaining the motion for new trial.

The judgment of the trial court is affirmed and the case is remanded for a new trial as ordered by such judgment.

STONE, P. J., and McDOWELL, J., concur.

Anderson v. Kraft, Mo.App., 129 S.W.2d 85.

11. 98 C.J.S. Work and Labor § 57, p. 808; 15 Am.Jur., Damages, sec. 140, p. 549; Murphy v. S. S. Kresge Co., Mo.App., 205 S.W.2d 252; Rodgers v. Levy, Mo.App., 199 S.W.2d 79.

12. 88 C.J.S. Trial § 382, p. 991; Roller v. Montgomery's Estate, Mo.App., 45 S.W. 2d 945; Townsend v. Moseley, 234 Mo. App. 538, 134 S.W.2d 660; Cowan v. Hydraulic Press Brick Co., Mo.App., 222 S.W. 924; Vogelgesang v. Waelder, Mo. App., 238 S.W.2d 849; see Brown v. Green, Mo.App., 168 S.W.2d 464; Neal v. Curtis & Co. Mfg. Co., 328 Mo. 389, 41 S.W.2d 543; De Long v. Broadston, Mo.App., 272 S.W.2d 493.