Sam VOSEVICH, Plaintiff-Respondent,

v.

DORO, LTD., a corporation, et al.,
Defendants-Appellants.

No. 36546.

Missouri Court of Appeals,
St. Louis District,
Division One.

Feb. 24, 1976.

Motion for Rehearing to Court En Banc
or to Supreme Court Denied
April 13, 1976.

Application to Transfer Denied
June 14, 1976.

Greensfelder, Hemker, Wiese, Gale & Chappelow, James L. Hawkins, Jerry D. Perryman, St. Louis, for defendants-appellants.

Lewis, Rice, Tucker, Allen & Chubb, James W. Herron, St. Louis, for plaintiff-respondent.

DOWD, Judge.

Plaintiff brought this quantum meruit suit to recover the reasonable value of his services in selling and promoting football shoes. Plaintiff sued Doro, Ltd., David R. Mars, Jr., and George P. Meier. The jury found for the plaintiff against all the defendants and assessed his damages at $64,500. We reverse the judgment and remand the cause for a new trial.

In determining the sufficiency of plaintiff's evidence, this court must give the plaintiff the benefit of every reasonable favorable inference which the evidence tends to support. *Bremen Bank & Trust Co. v. Bogdan*, 498 S.W.2d 306[1] (Mo.App. 1973); *James v. Turilli*, 473 S.W.2d 757[6] (Mo.App.1971).

The plaintiff's evidence tended to show the following. The defendant corporation is a St. Louis County firm that imported and sold a football shoe called the "Viking Athletic Shoe." Defendants, David R. Mars, Jr., and George P. Meier had originally formed a partnership, "M & M Imports," in 1961. In March 1966 the two men incorporated and were the sole stockholders of the defendant corporation. The plaintiff worked for the defendants from late 1965 through 1970, and during that period sales of Viking shoes increased from $17,512 in 1966 to $259,518 in 1970.

Plaintiff had been Mars' junior high school football coach and met Mars accidentally in late 1965 and was shown the Viking football shoe. At that time the shoe was not selling and was no longer being imported. The plaintiff, impressed by the comfort and safety features of the shoe, was the first person to recognize these features and integrate them into a sales approach.

Plaintiff's sales approach was to market the shoes not as store items but as specialty items with emphasis on the safety features of the shoes. From late 1965 to 1967 plaintiff personally delivered his sales talks to the Little League, high school and college football coaches and athletic directors in the St. Louis area. Although plaintiff sometimes wrote orders on the spot, the football officials usually sent their orders to the office after he had departed. Thus plaintiff has no direct knowledge of the number of local area sales that resulted from his efforts.

In 1967 plaintiff and the individual defendants decided to sell the shoes nationally, and a local sporting goods store thereafter handled all St. Louis area reorders. The new sales strategy was for plaintiff and one of the individual defendants to attend sporting goods and athletic conventions and shows throughout the country in order to promote shoe sales. At these shows they would contact manufacturers representatives and try to interest them in selling the shoes in their sales territories.

From 1966–70 plaintiff attended approximately a dozen shows. Sometimes the plaintiff alone attended these shows, but usually Mars went with him. If accompanied by Mars, plaintiff would do about 90% of the work in the booth, and Mars permitted plaintiff to do almost all the talking. At these shows plaintiff would first interview prospective manufacturers representa-

tives; he would deliver his sales talk and then insist the representatives sell the shoes as a specialty item. If plaintiff was favorably impressed with the prospective representatives he would recommend them to Mars. Mars always made the final hiring decisions, but he always seemed to follow the plaintiff's recommendations.

From 1966–70 plaintiff held the title of "National Sales Manager" for the shoes, and he sent out correspondence over his signature. Besides interviewing prospective representatives at shows, the plaintiff performed many other tasks. He kept up his contacts with area football officials. He occasionally telephoned the representatives to motivate them or help with their sales approaches. Plaintiff once made a trip to Tulsa to increase sales in that area. He once made a trip to collect a business debt for the defendants. The plaintiff helped Mars entertain European businessmen in his home. He came to the office on occasion and wrote correspondence, plus helping in the preparation of sales brochures the defendants mailed to prospective customers.

Plaintiff characterized himself as the "outside" man, who was responsible for the selling and promoting of the shoes. Mars was the "inside" man, in charge of clerical work, desk work, shipments, orders, and other duties.

During all this time plaintiff worked two weeks every month for the defendants, averaging about 25 hours per week. The remainder of the month plaintiff was an insurance consultant in New Orleans. Plaintiff never demanded any compensation for his sales and promotional services because he and Mars were good friends, and because he knew the company was struggling during its early years. Plaintiff was reimbursed for most of his show expenses, but he was never compensated for his services. The plaintiff and Mars sometimes discussed compensation, but no definite agreement was ever concluded. The compensation plaintiff desired and expected, however, was an interest in the company once shoe sales were substantial.[1]

The defendants' first contention on appeal is that the trial court erred in admitting into evidence certain financial information about the defendants. Defendants claim this financial information not only was irrelevant to the case's contested issues, but was a prejudicial factor in the jury's consideration of the reasonable value of plaintiff's services. We agree.

Over defendants' objections the trial court admitted into evidence the following financial information: (A) The company dividends paid in 1969 to Mars and Meier, the sole stockholders, amounting to $7500; in 1970, $4600. (B) The company's gross profits for 1969, computed by deducting the cost of goods sold from the gross sales receipts, were $52,538. The net profits for 1969 were $6283. The company's gross profits for 1970 were $94,580. (C) The company's retained earnings at the end of 1969 were $16,077; at the end of 1970, $40,531. (D) The initial investments of Mars and Meier in Doro, Ltd., totalled $4912. (E) As of December 31, 1970, the fair market value of the company was estimated at approximately $300,000.

We note the general rule is that evidence of the wealth or financial standing of the parties is not ordinarily admissible in contract actions. 22 Am.Jur.2d Damages, § 319 (1965). Missouri has adopted this rule for both contract actions and quantum me-

---

1. The defendants' evidence considerably downplayed the nature and extent of the plaintiff's services. Defendants' evidence included testimony that: (1) Mars designed and developed the shoe in 1964. (2) The plaintiff was not the first person to recognize the shoe's safety features, nor was he even the first to sell the shoes directly to local football teams. (3) Mars and his father were solely responsible for planning and preparing all brochures, advertisements. (4) Mars and his father made the key 1967 decision to sell the shoes nationally. (5) Mars was the man who initially contacted prospective sales representatives and then maintained contact after he hired them. (6) Mars compensated plaintiff for his show expenses and also paid him $4200 for his services. (7) By the year 1970, the defendants had a total of 20 sales representatives selling the shoes.

ruit suits. *Springli v. Mercantile Trust Co.,* 33 S.W.2d 311[1–2] (Mo.App.1960). Evidence of the defendants' financial worth is admissible in an action seeking punitive damages. *State ex rel. Kubatzky v. Holt,* 483 S.W.2d 799[9] (Mo.App.1972). This is not an action seeking punitive damages but rather an action for compensatory damages.

■ A quantum meruit suit is grounded on the principle that no one should be unjustly enriched at the expense of another. *Cavic v. Missouri Research Laboratories, Inc.,* 416 S.W.2d 6, 8 (Mo.App.1967). The general rule concerning the measure of recovery in quantum meruit actions for services furnished is as follows:

> "The measure of recovery for services furnished or goods received under the doctrine of unjust enrichment, as distinguished from the doctrine of contracts implied in fact, is the value of the actual benefit realized and retained. If there is no special agreement as to the amount of compensation and the services are not intended to be gratuitous, the law implies a promise by the employer to pay what services reasonably are worth, which is determined largely by *the nature of the work and the customary rate of pay for such work in the community and at the time the work was performed.*" 66 Am. Jur.2d, Restitution and Implied Contracts, § 28 (1973). (Emphasis added).

This measure of recovery in quantum meruit suits for services was applied in the case of *Cavic v. Missouri Research Laboratories, Inc.,* supra. There a sales representative brought a quantum meruit action for a sum he claimed was due him as commissions on orders he obtained for the defendant company. The court said the sales representative could recover the price usually and customarily paid for his services or like services at the time and in the locality where the services were rendered.

Plaintiff does not agree with this method of computing the reasonable value of the services. Plaintiff maintains that the benefit received by the defendants is a principal factor to be considered by the jury in arriving at a determination of the reasonable value of the services rendered by the plaintiff. Thus the plaintiff contends the financial information about the defendants is a valuable indication of the benefits they received from the plaintiff's efforts. To support this idea, plaintiff claims he was a prime mover in the shoe sales program; that the shoe sales were always a principal component of the company's total sales; that in 1969 and 1970 the shoe sales actually accounted for all of the company's gross sales receipts. As plaintiff notes in his appellate brief: "To determine benefit, it is obviously necessary to know where the growth began and where it ended."

■ We believe the measure of recovery described in *Cavic,* with its emphasis on the nature of plaintiff's services and the customary community charges for the services, is the proper approach. Having the reasonable value of plaintiff's services dependent on the financial benefits of the defendants is not the Missouri law.

In his brief plaintiff correctly notes: "It is patently absurd to say that the results of a sales program has no relevance to the question of what was the reasonable value of the services of the sales manager. Services performed in setting up and administering a sales program which was a flop are obviously of far less value than sales services performed which result in the success which was enjoyed by the defendants herein." The trial court admitted into evidence the yearly sales totals for the shoes, and the defendants do not dispute this on appeal.

■ The shoe sales figures are important for the jury's determination of the nature of plaintiff's services and the computation of the customary rate of compensation for such work in the community. But the other financial information about the defendants should not have been admitted because it distracts the jury from its careful scrutiny of the plaintiff's services and the evaluation to be placed on these services. If the defendants in this case had sustained losses

for the 1966–70 period, despite the success of the shoe sales, would plaintiff have introduced the financial information? And if the defendants had attempted to introduce evidence of these losses, we are sure plaintiff would have promptly objected to its admission, arguing that his sales efforts were successful despite the defendants' losses and his quantum meruit recovery should not be diminished due to the losses.

The plaintiff's contention that the defendants' financial information is relevant to the evaluation of his services directly conflicts with his handling of his expert witnesses. The plaintiff presented two expert witnesses to establish the reasonable value of his efforts. In counsel's long hypothetical questions to these experts, the only financial data given concerning the defendants was the increase in shoe sales during the years plaintiff worked for the defendants. The remaining information given to the expert witnesses detailed the nature of plaintiff's sales and promotional services.

■ Even assuming arguendo that the defendants' financial benefits could be a principal factor in determining the value of plaintiff's services, we still believe this evidence would be inadmissible. The plaintiff's evidence tended to establish a definite correlation between his efforts and the yearly shoe sales figures. But the evidence suggested only a tenuous and speculative link between plaintiff's efforts and the financial information about defendants' profits, retained earnings, dividends, fair market value and initial investment. Defendants' counsel properly maintains that such financial information is dependent not only on sales, but also on such factors as "the product being sold, costs of goods, expenses of making sales, cost of borrowed money, competitive market conditions, overhead, knowledge of importing, terms of payment to manufacturers, judgment in extending credit, distribution and the performance of Dave Mars and other employees." Even the plaintiff's evidence showed that he was involved only in the sales and promotion aspects of the business; that Mars handled the office work; that Meier was the financier.

We have found three Missouri cases that are somewhat analogous to the instant case. In *Rolla Lumber Co. v. Evans*, 482 S.W.2d 519 (Mo.App.1972), the plaintiff corporation brought a quantum meruit action to recover the reasonable value of materials furnished. The court first noted plaintiff had produced no evidence that its charges were fair and reasonable. The court added that it "had not overlooked the novel and ingenious argument of plaintiff's counsel, wholly unsupported by cited authority, that the fair and reasonable value of the materials sold and billed to Gardner should be 'that value or amount by which the defendants' property has been increased because of the application of the material.'"

In *Hardy v. Bruns*, 384 S.W.2d 865 (Mo. App.1964), the plaintiff sought to recover for work performed under an oral agreement by defendant to pay for such work at a specified hourly rate. The plaintiff introduced the defendants' bank book and evidence of his bank deposits. The court reversed, noting (at p. 867):

"The fundamental issues in dispute were the number of hours plaintiff had labored for defendant, and whether defendant had paid her for the time she worked. Plaintiff seeks to justify the admission of such evidence on the ground that it '. . . was relevant and corroborative of plaintiff's efforts and work on the farm for the defendant, and which contributed to defendant's earnings. . . .' Implicit in that argument is the highly dubious assumption that two persons working on a farm will necessarily and invariably produce more income therefrom than one. *But even under plaintiff's theory of relevancy the burden was on her to establish that the deposits made were derived from defendant's farming operation before such evidence was admissible.* Admittedly, no such foundation was laid. Hence the evidence as to defendant's bank book and deposits did not tend to prove or disprove the

number of hours plaintiff had worked, or whether she had been paid, and was therefore irrelevant and prejudicial." (Emphasis added).

Likewise, in the instant case the plaintiff has failed to establish to what extent, if any, his claimed sales and promotional efforts were responsible for the defendants' financial condition. Thus the financial information does not tend to prove or disprove the reasonable value of plaintiff's services.

The plaintiff in *Springli v. Mercantile Trust Co.,* 333 S.W.2d 311 (Mo.App.1960), sought to recover for services rendered defendant's testator. The suit was in two counts. Count I sought recovery on an express contract. Count II was in quantum meruit for the reasonable value of services rendered. This court upheld the trial court's refusal to admit into evidence the dollar value of decedent's estate, noting (at p. 315): "Under Count II of the petition, if plaintiff was entitled to recover, he was only entitled to recover the reasonable value of the services performed. The measure of this recovery should be the worth recognized by the public generally, without reference to the pecuniary standing of the parties."

■ Plaintiff contends that evidence of the net and gross worth of the benefited party in claims for compensation for reasonable value of services performed is admissible. We disagree. Plaintiff relies on four cases. We find the cases distinguishable.

In *Anderson v. Caldwell,* 242 Mo. 201, 146 S.W. 444 (1912), plaintiff brought a quantum meruit suit to recover the value of materials and labor furnished defendants in the construction of buildings for the 1904 St. Louis World's Fair. The court first broadly noted that in a quantum meruit suit "the defendant should respond to the extent of the benefits received." But the court later defined the measure of recovery as the "reasonable value of such work and labor done."

Plaintiff cites *State ex rel. Missouri Broadcasting Co. v. O'Malley,* 344 Mo. 639, 127 S.W.2d 684 (Mo. banc 1939). In that case plaintiff had sued relator on both contract and quantum meruit counts. The Supreme Court upheld the defendant trial court's issuance of a pre-trial order to permit plaintiff to inspect relator's cash books, journals and general ledger for the period of plaintiff's employment.

We first note that *O'Malley* concerns a *pre-trial* discovery motion *to inspect* certain books and records and did not involve the admissibility of evidence at trial. Nor did the court in *O'Malley* specify just what information could be gleaned from the corporate records and introduced at the trial. Only relevant financial information can be used at a trial to prove reasonable value of services.

We have determined that the defendants' financial information in this case (1) is not relevant to the Missouri method of computing plaintiff's quantum meruit recovery and (2) is not probatively linked to the plaintiff's sales and promotional efforts.

*Wandling v. Broaddus,* 10 S.W.2d 651[6] (Mo.1928), was a quantum meruit suit against an estate to recover the reasonable value of services rendered the decedent. After the defendants had introduced a copy of the will that left plaintiff nothing, the plaintiff was permitted to introduce into evidence the inventory and appraisement of the decedent's estate because it tended to show that decedent at the time she promised to pay had property with which to pay.

Plaintiff's last case is *Savage v. Michalon's Estate,* 176 S.W.2d 626[6] (Mo.App. 1944). A plaintiff farmhand brought a quantum meruit suit for services rendered the decedent. The court permitted plaintiff to introduce the inventories and appraisement of the estate for two very limited purposes: (1) to corroborate plaintiff's evidence concerning a future settlement by showing that decedent had money with which to make such settlement which decedent promised he would make when the plaintiff grew old; and (2) to settle a dis-

pute about the size of the farm and the necessity for services to operate it.

To summarize, we believe the trial court committed prejudicial error when it admitted the financial information concerning defendants. This information was not relevant to the Missouri method of determining the reasonable value of plaintiff's services in a quantum meruit suit. Nor was there a probative link between plaintiff's efforts and the resultant financial condition of the defendants. With this financial evidence before it, the jury could have easily been misled into awarding plaintiff an excessive amount of damages.

The defendants' second contention on appeal is related to their first: "It was prejudicial error for the court to permit plaintiff to comment upon, inquire and introduce evidence concerning an exchange by defendants, Mars and Meier, of the stock of Doro, Ltd., for stock of Medalist Corporation, in that such comment, inquiry and evidence, coupled with references to net worth, dividends, profits, investment and retained earnings of Doro, Ltd., were all calculated to prejudice and bias the jury." In their brief defendants contend the plaintiff's strategy was "to focus attention on the Medalist stock exchange and persuade the jury out of prejudice and sympathy to give plaintiff a large verdict based on the alleged sums of money involved in that exchange."

■ Although the trial court often sustained defendants' objections to the admission of this stock exchange evidence, the defendants specifically note four instances where the trial court permitted such evidence. We will examine these instances to see whether the evidence should have been admitted and whether the defendants' case was thereby prejudiced.

During his opening statement the plaintiff's attorney stated:

"We expect the evidence will be that in fact an agreement was made verbally right around February 15, 1971, within a month and a half that they had sent Sam out the door, to transfer those 500 shares of Doro stock for which they invested $4912 into Medalist Industries, a company which was being traded on the American Stock Exchange, which was for 32,500 shares of Medalist Industries stock that had a value of $16⅛ per share, and the total value of $524,062.50 as an investment."

We believe the trial court committed prejudicial error when it overruled defendants' objection to this portion of the plaintiff's opening statement. The stock transfer evidence—especially the dollar amounts and the number and evaluation of the stock shares—was highly prejudicial to the defendants. Our reasoning is the same as in our discussion of the defendants' first point on appeal. The inherent prejudicial impact of the stock transfer evidence was enhanced by its introduction at the very beginning of the trial, before the parties had presented any evidence.

■ We are aware that counsel is permitted considerable latitude in making his opening statement. *Zabol v. Lasky,* 498 S.W.2d 550 (Mo.1973). However, even though comments made by counsel in opening statements are not evidence, counsel is not permitted to relate to the jury prejudicial matters which are not admissible as evidence.

The defendants also complain about two references during the trial to the value of the stock exchange. On direct examination the plaintiff related that Mars had once told him that Medalist had made a $600,000 offer to purchase Doro, Ltd. The trial judge properly sustained the defendants' objection, ordered the answer stricken, and instructed the jury to disregard it.

■ Shortly thereafter, during the same line of questioning, plaintiff was asked whether he had ever asked Mars what his percentage would be if the company were sold. Plaintiff replied: "Well, while talking about this sale to Medalist I had mentioned something about the ten percent that we had been discussing, and he remarked to

me 'It would be like giving you $60,000.' And I said, 'That's right.' " Defendants did not object to this answer, and so the answer was before the court below and the jury for whatever weight it was deemed entitled. *Rooney v. Lloyd Metal Products Co.,* 458 S.W.2d 561[1] (Mo.1970).

Finally, defendants complain about the facts elicited during the cross-examinations of Mars and Meier. Earlier the trial court had not permitted into evidence Plaintiff's Exhibit # 37, a document that contained the details of Medalist's acquisition of Doro, Ltd. Over defendants' objections, plaintiff highlighted certain aspects of the document, especially a provision wherein Mars and Meier had agreed to indemnify Medalist for any obligations (presumably including the plaintiff's) incurred by Doro, Ltd., but not listed in the document.

We believe the trial court correctly permitted the evidence of the indemnity clause, for this evidence was obviously intended to show Mars's and Meier's interest in not having a judgment rendered against the corporate defendant. Proof of a witness's or party's bias or prejudice in favor of or against any of the parties to an action may properly be shown and considered as bearing upon the credit which should be accorded the testimony of a witness. *State v. Williams,* 513 S.W.2d 718[7] (Mo.App.1974); *State v. Curry,* 372 S.W.2d 1[7] (Mo.1963); *State v. McLachlan,* 283 S.W.2d 487[1] (Mo.1955). When bias or prejudice is being explored, broad discretion is vested in the trial court as to the extent of the cross examination. *Hesse v. Wagner,* 475 S.W.2d 55[10] (Mo.1971). Courts have even held that circumstances showing a witness's or party's bias and his relation to or feeling toward a party are not irrelevant or immaterial matters (a) even though they have no evidentiary bearing on the issues tendered by the pleadings, *Thornton v. Vonallmon,* 456 S.W.2d 795[2] (Mo.App. 1970) and (b) even though the evidence may have a prejudicial effect on the jury. *State v. McClure,* 504 S.W.2d 664[7] (Mo.App. 1974).

We believe the cross examination of Mars and Meier concerning their indemnity agreement with Medalist was proper, for it tended to show their interest in a jury verdict for co-defendant Doro, Ltd.

Defendants next contend the trial court erred in denying their motion for a directed verdict because there was a failure of proof necessary to support the opinions of plaintiff's expert witnesses as to the value of plaintiff's services. The defendants correctly note that the expert witnesses' valuations of plaintiff's services were based on the assumptions that (1) plaintiff developed a unique marketing plan for the shoes and (2) plaintiff was the first to develop the shoe's unique features. Defendants contend "the plaintiff's own testimony fails to support this hypothetical question" and that the defendants' evidence shows the two underlying assumptions were totally false.

The facts upon which an expert's opinion is based, like the facts sufficient to support a verdict, must measure up to the legal requirements of substantiality and probative force; and the question of whether such opinion is based on and supported by sufficient facts or evidence to sustain the same is a question of law for the court. *Atcheson v. Braniff International Airways,* 327 S.W.2d 112[6] (Mo.1959). In this case we recognize that the defendants produced cogent evidence that directly contradicted the plaintiff's evidence concerning his part in developing and marketing the football shoes. However, we cannot say as a matter of law that the defendants' evidence nullified the assumptions on which the expert witnesses based their valuations. We decide this point against defendants.

The defendants' last contention is that the trial court erred in denying the individual defendants' motion for directed verdict because plaintiff had rendered no services for individual defendants Mars and Meier. Considering the evidence in a light most favorable to the verdict, giving plaintiff the benefit of every reasonable inference supported by the evidence, we believe

that while the proof of plaintiff's services rendered to the individual defendants was not overwhelming, it was sufficient to make a submissible case. *Bremen Bank & Trust Co. v. Bogdan,* 498 S.W.2d 306 (Mo.App. 1973).

The judgment is reversed and the cause remanded for retrial.

WEIER, P. J. and RENDLEN, J., concur.