**RICHARD B. CURNOW, M.D., INC.,**
Plaintiff-Respondent,

v.

**Gary SLOAN, Defendant and Third-Party**
Plaintiff-Respondent,

v.

**BLUE SHIELD, Defendant-Appellant.**

No. 62987.

Supreme Court of Missouri,
En Banc.

Dec. 8, 1981.

Rehearing Denied Jan. 12, 1982.

Max O. Bagby, Kansas City, for defendant-appellant.

Vincent F. Igoe, Jr., Liberty, for plaintiff-respondent.

C. David Whipple & David W. Whipple, Kansas City, for defendant and third-party plaintiff-respondent.

HIGGINS, Judge.

In an action in quantum meruit, the court awarded plaintiff physician a judgment against defendant Blue Shield. The Court of Appeals, Western District, per Dixon, J., affirmed the judgment. The case was transferred by this Court on the question of sufficiency of evidence to support the judgment. Affirmed.

In August 1977, Virginia, daughter of defendant Sloan, was treated for an arm fracture at the emergency room of Liberty Hospital by Dr. Voy, an employee of the plaintiff, an orthopedic surgeon in Liberty, Missouri. Plaintiff charged a total of $380.50 made up of $50.00 for emergency room consultation, $68.00 for x-rays, and $262.50 for a closed reduction of the fracture and four office visits.

Mr. Sloan was a member of the United Auto Workers. His union had a health benefit contract with third-party defendant, Blue Shield, which included a "hold harmless" clause whereby Blue Shield would assist and defend the insured in the event that a non-participating[1] physician charged more than Blue Shield felt was usual and customary. Plaintiff was a non-participating physician.

Blue Shield did not dispute the x-ray fees, but determined that the total of $312.50 for the emergency room consultation and fracture reduction services was excessive. Under its "peer group" procedures, Blue Shield established a fee of $200.00, leaving a balance of $112.50.

Plaintiff's action against Mr. Sloan was for this balance. He alleged that the total fee charged was the reasonable value of the treatment received by the patient. Mr. Sloan added Blue Shield as a defendant in accordance with the hold harmless provision; Blue Shield stipulated to pay any judgment entered for plaintiff. The court found for plaintiff in the amount of the unpaid balance.

Blue Shield charges the court erred in its judgment "because proof of the reasonable value of the services rendered is essential to recovery in quantum meruit; and plaintiff's failure to present any evidence as to the reasonable value of the services rendered to defendant Sloan's daughter is fatal to plaintiff's recovery in quantum meruit." It argues that plaintiff must prove the reasonable value of his fee in the community where the services are rendered by expert opinion evidence.

---

1. Participating physicians agree to accept as full payment for their services a fee in an amount determined to be reasonable, usual and customary by Blue Shield internal procedure.

■ Recovery in quantum meruit for services performed is limited to the reasonable value of the services. *See St. Charles Floor Co. v. Hoelzer,* 565 S.W.2d 844 (Mo.App.1978); *Vosevich v. Doro, Ltd.,* 536 S.W.2d 752 (Mo.App.1976). The question in such a case is whether the evidence is sufficient to support the trial court's judgment that the plaintiff's charge for his services was reasonable. "[T]he decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, .... Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

Dr. Curnow testified that he had treated "in the neighborhood of 200" fractures of the type suffered by Virginia Sloan; that his patients generally come "from a wide range—in north Missouri and locally, but mostly from the surrounding counties, primarily from Clay, some from Platte, quite a few from Ray County." He had never experienced a challenge to the reasonableness of this fee for this service by anyone, including Blue Shield and other insurance companies. Only six weeks prior to the present dispute, Blue Shield had paid the same charge in a similar case.

Dr. Curnow also testified that when he began his practice, he used a relative value scale obtained from the Academy of Orthopedic Surgeons in order to establish his fees, and had made adjustments since that time for inflation and other added costs.

■ Because the question of reasonableness of medical fees is not a matter of common knowledge, expert testimony is necessary to aid the trier of fact in making this determination. *Tuttle v. Brayton,* 215 S.W.2d 46 (Mo.App.1948). Plaintiff's testimony qualified him as an expert and his qualifications were not questioned. The plaintiff's own testimony, considering his first hand knowledge of this case as well as

his professional opinion, establishes the reasonableness of the fee in question. *Bodde v. Burnham,* 588 S.W.2d 516 (Mo.App.1979).

■ Blue Shield would have its procedures by which it establishes fees for participating doctors conclusive on the question of reasonability of plaintiff's charges. Such testimony does not warrant reversal of the court's resolution of the question. Opinions of experts, when in conflict, must be weighed by the trier of fact and considered in light of such matters as the experience, knowledge, attention given to the case, and the interest of each. The reasoning underlying the expert's opinion and credibility is important. The trial court, as fact finder, in finding for plaintiff, obviously discounted the contrary evidence on such grounds.

■ Blue Shield argues that community standards is an essential aspect of reasonableness. It asserts that because the plaintiff offered no testimony explicit on what other physicians charged, his action must fail. Although evidence of what is charged by others in the community can be considered, it is not dispositive. *Baker v. Brown's Estate,* 294 S.W.2d 22 (Mo.1956) and *Vosevich v. Doro Ltd., supra,* do consider locality as a factor in determining the reasonableness of fees; however, neither holds this to be a necessary element thereof. If, as the trial court could have found, an estimated 200 patients and insurance companies in the area paid this fee for this particular service without complaint, a finding that it was also charged by some number of other doctors is not required. For that matter, plaintiff testified his initial fee base was that set by a national association of his colleagues, and that provides some additional evidence of a community standard. Each case is different, and plaintiff's testimony alone can establish the reasonable value of his charge, considering the professional base fee upon which it was founded. In this case, plaintiff demonstrated that he did not arbitrarily establish his fees, and that the amount billed to Sloan was the standard charge made by the plaintiff for the services performed for and accepted by patients in the geographical area served by his practice.

The trial court resolved the issue for the plaintiff, and there is nothing in this record to require reversal on the ground that the judgment is unsupported. Rule 73.01; *Murphy v. Carron, supra.*

Affirmed.

RENDLEN and MORGAN, JJ., concur.

DONNELLY, C. J., concurs in separate concurring opinion filed.

WELLIVER, J., dissents in separate dissenting opinion filed.

SEILER and BARDGETT, JJ., dissent and concur in separate dissenting opinion of WELLIVER, J.

DONNELLY, Chief Justice, concurring.

If I may be indulged an observation:

This Court is authorized to transfer a case from the Court of Appeals to this Court *only* (1) because of the general interest or importance of a question involved in the case; or (2) for the purpose of reexamining the existing law; or (3) for the reason that the opinion filed in the Court of Appeals is contrary to a previous decision of an appellate court of this state. Mo.Const.art. V, § 10; Rule 83.03.

The sole issue in this case is whether the evidence is sufficient to support the judgment. In my view, this Court erred in ordering the case transferred.

I concur.

WELLIVER, Judge, dissenting.

I respectfully dissent.

The sole legal issue is whether Dr. Curnow has sustained the burden of proving the elements necessary to sustain the judgment for his fee based upon quantum meruit.[1] As so frequently happens, the cases having the most effect upon our law are cases which involve more *principle* than *principal.* This case, which would in my opinion change our rules of proof for quantum meruit substantially, is no exception. The principal is the $112.50 remaining unpaid on the doctor bill over and above the $200 already paid by Blue Shield. The principle here involved is whether Blue Shield, and anyone else for that matter, can continue to rely upon the courts to enforce the traditional rules for proving the value of services based upon quantum meruit. A side issue which explains the presence of this otherwise insignificant case in our Court, arises out of the basic structural concept upon which Blue Shield medical payment plans were founded. This side issue has no relevance to the legal issue of the case.

The structural concept of Blue Shield contemplates that the association will sign up a substantial portion of the doctors in a community as "participating physicians". Those not so signing are denominated or known as "non-participating physicians". A so-called "peer group" from among the "participating physicians" establishes the reasonable and customary charge for each medical service or procedure rendered within the community. In consideration of their participation Blue Shield agrees to pay direct to participating physicians the amount so established. There is also built into the establishing of fees a gradual escalation of the approved fees based upon reported charges. If non-participating physicians refuse to accept the amount tendered or covered by Blue Shield, their legal remedy is, as here, to sue the patient for the fee based upon quantum meruit,[2] a recovery also based upon the reasonable value of the

---

1. In its simplest form, quantum meruit is defined as:

   QUANTUM MERUIT. As much as he deserved. In pleading. The Common Court in an action of *assumpsit* for work and labor, founded on implied *assumpsit* or promise on the part of the defendant to pay the plaintiff *as much as he reasonably deserved* to have for his labor. 3 Bl.Comm. 161, 1 Tidd Pr. 2;

   *Viles v. Kennebec Lumber Co.,* 118 Me. 148, 106 A. 431.
   Black's Law Dictionary, 4th Ed. (emphasis in original).

2. This case, as tried, is cluttered by yet another side issue also without relevance to the real issue of the case. See principal opinion and footnote 1 thereof, explaining the union contract and its "hold harmless" provision.

charges for the same or similar services within the community. Upon these premises, so-called "premiums" or charges for medical payment reimbursement are established by the Blue Shield Association. Were the association obligated to pay all fees submitted and demanded by non-participating doctors regardless of these contractual agreements and regardless of long established legal rules· regarding proof for recovery based upon quantum meruit, then actuarial determination of the "premiums" would be nearly impossible and a matter of rank speculation.

We need look only to Dr. Curnow's testimony to determine whether he sustained his burden of proving the elements of quantum meruit. There is no question but what we would normally expect Dr. Curnow, otherwise an expert in his profession, to qualify as an expert witness both as to the reasonableness of his own charges, and as to the reasonable charges made by others for the same or similar services or procedures in the community. However, a fair reading of all of Dr. Curnow's testimony reflects not only a stubborn refusal to state that his own charges are reasonable, but also an absolute denial that he has knowledge of what others charge for the same or similar services in the community, thereby setting the stage for a test of the basic concept upon which the Blue Shield Association medical payment plan is based. This explanation of the otherwise irrelevant side issue serves only to explain why the parties would spend in legal costs many times the amount of the judgment in this case.

The elements required for proving a claim for services based upon quantum meruit are clear and well established in the case law of Missouri.

In order to sustain a claim in quantum meruit for the value of services rendered, the plaintiff has the burden of proving the reasonable value of the services he rendered. *Baker v. Brown's Estate*, 294 S.W.2d 22 (Mo.1956); *Strauser v. Estate of*

*Strauser*, 573 S.W.2d 423, 424 (Mo.App. 1978); *St. Charles Floor Co. v. Hoelzer*, 565 S.W.2d 844, 848 (Mo.App.1978); *Cavic v. Missouri Research Laboratories, Inc.*, 416 S.W.2d 6, 8 (Mo.App.1967); *Service Construction Co. v. Nichols*, 378 S.W.2d 283, 289 (Mo.App.1964); *Tuttle v. Brayton*, 215 S.W.2d 46, 49 (Mo.App.1948). *See* 61 Am. Jur.2d Physicians, Surgeons & Other Healers § 380 (1981). The plaintiff can carry this burden *only* by proving that his valuation of his services closely approximates the "price usually and customarily paid for such services or like services at the time and in the locality where the services were rendered." *Baker v. Brown's Estate*, 294 S.W.2d at 27; *accord, Glover v. Henderson*, 120 Mo. 367, 25 S.W. 175, 178 (Mo.1894); *Vosevich v. Doro, Ltd.*, 536 S.W.2d 752, 756 (Mo.App.1976); *Cavic v. Missouri Research Laboratories, Inc.*, 416 S.W.2d at 9; *Service Construction Co. v. Nichols*, 378 S.W.2d at 289; 98 C.J.S. Work and Labor §§ 52, 65b (1957); 66 Am.Jur.2d Restitution and Implied Contracts § 28 (1973).

Since reasonableness of medical fees is not a matter of common knowledge, expert testimony concerning their reasonableness is required to assist the trier of fact. *Allmon v. Allmon*, 314 S.W.2d 457, 462–63 (Mo. App.1958); *Tuttle v. Brayton*, 215 S.W.2d at 49; *see Berra v. Bieg Plumbing Co.*, 584 S.W.2d 116, 119 (Mo.App.1979); *Vosevich v. Doro, Ltd.*, 536 S.W.2d at 757; *Cavic v. Missouri Research Laboratories, Inc.*, 416 S.W.2d at 8. While we have conceded that Dr. Curnow is an expert orthopedic physician and should have sufficient expertise to testify as an expert and prove the reasonableness of his own charges, nothing in the law makes such expertise self-proving nor is there any expert who cannot by his own testimony disprove his expertise. We must examine Dr. Curnow's testimony.

The far reaching effects of this otherwise "small-claim" require quoting both extensively and comprehensively from the short transcript.[3]

---

3. The extensive quotation of questions and answers also may serve to fulfill our obligation to give guidance to the bar as to the proper method of proving quantum meruit in future cases, should the principal opinion prevail.

The principal opinion states that "The plaintiff's own testimony, considering his first hand knowledge of this case as well as his professional opinion, establishes the reasonableness of the fee in question". (citation omitted), and that "plaintiff testified his initial fee base was that set by a national association of his colleagues, and that provides some additional evidence of a community standard."

Plaintiff-respondent, Dr. Curnow, testified:

Q. Doctor Curnow, in initially establishing the fees that you charge when you first came in practice in this area, you indicated that you used a relative value scale. What was that? I mean what—

A. What was the relative value scale that I used?

Q. Well, where did you get this relative value scale?

A. I got from the *Academy* of Orthopedic Surgeons.

Q. Okay. Are you a member of the Academy of Orthopedic Surgeons?

A. Yes, I am. Well, I'm—no, I take that back. I'm not—I've got application in at this time. It is a waiting period after you're Board qualified, after you're Board certified. There's a waiting period before you join the Academy.

Q. Okay. That was the only basis you had. You didn't talk to any other orthopedists in this area concerning fees that they charge?

A. Not—

Q. Did you know whether they were participating or non-participating physicians?

A. Had no idea.

Q. How many orthopedists practice medicine—practice orthopedics in Clay County, Missouri?

A. How many practice? There's around a dozen.

Q. Okay. Do you know as to those individuals, whether or not they are participating or non-participating members?

A. Have no idea.

Q. And do you fellows sit around and discuss the amount of fees that you're going to charge people or how much you're going to charge for a particular procedure?

A. Never.

Q. Okay. Is there any reason why you don't?

A. There's no reason that we should.

. . . .

(Emphasis added.)

Q. Okay. Approximately in the time you've been in practice, how many of these, according to your records, have you treated?

A. In all the time I've been in practice?

Q. Since you've been in practice here in this community.

A. This would be an estimate, you know. I would say, probably in the neighborhood of 200.

Q. Okay. Now, there's another injury called a collex fracture; is that correct?

A. Yes. Yes.

Q. Is that a similar—

A. It is a similar fracture. It is a term usually reserved for adult fractures of the same area of the anatomy.

Q. I see. When you say the figure 200, does that include these types of fractures, also?

A. Yes.

. . . .

Q. You've brought in approximately 47 files. Are these the files on the patients that you have treated in the last—

A. Yes.

Q. —few years for this particular type of injury?

A. Yes, sir.

Q. And have you been paid the amount of $262.50 and $50.00 for the emergency room consultation in each of those cases?

A. You mean for the fracture reduction?

Q. Yes.

A. Ever been paid that amount for the fracture reduction? Yes.

Q. Okay. And for the emergency room consultation?

A. Yes.

Q. Okay.

A. They paid my fee on that. Yes.

Q. Doctor, where do your patients generally come from?

A. My patients come from wide range—in north Missouri and locally, but mostly from the surrounding counties, primarily from Clay, some from Platte, quite a few from Ray County. Those—that's the majority of my patients.

. . . .

Q. Now, Doctor Curnow, you've indicated that on other procedures during this time period that we have discussed, you performed other, similar, closed reductions and hospital visits; is that correct?

A. Yes.

Q. And at my request you went through your files at your office and pulled the files on the various treatments; is that correct?

A. Yes.

Q. Okay. And you indicated that you've been paid by other insurance companies and by individuals, personally, for your services?

A. Yes.

Q. Have you ever had to sue any other individual for the collection of an account on this particular type of injury and the treatment of it?

A. No.

Q. Okay. Have you been paid the full amount for this procedure by Blue Cross-Blue Shield previously and on other occasions?

A. Yes, I have.

. . . .

Q. *Do you know what other doctors in the area charge for this same service?*

A. *I have no idea.*

Q. *If you were to learn that other doctors were charging less than you charge, would it affect the amount of your bill?*

A. *Not whatsoever.*

. . . .

(Emphasis added.)

Q. How did—do you recall how you set the fee prior to the present charge? In other words, the fee that you were charging for this service prior to the spring of '76?

A. Yes, I can tell you exactly how I set that fee. First of all, after meeting with no help when trying to discuss it with my older colleagues when I went into practice, not being able to find out the ball-park, I arbitrarily, initially, set some fees based on what I was able to get out of patients what they had paid for certain other orthopedic procedures in the recent future [sic]. I then, at that time, used a relative value scale which was then allowable, which is not apparently not [sic] allowable, so I've been told. But I used a relative value scale. I backed this figure through the relative value scale and came up with a unit value.

Q. Do you ever vary the fee charged for a given service?

A. Not the initial charge. I make allowances later if there are circumstances.

Q. Can you tell me some of the circumstances?

A. Yes. Very easily. Some people don't have any money. They don't have any insurance. They don't have any means. They have other problems. Sometimes it's Christmas and they've got a house full of kids. I take a lot of things under consideration.

Q. So, in other words, you reduce your fee in the event of difficult ability to pay on the part of the patient?

A. Very true.

. . . .

Q. You charge this fee, which is the highest fee that you charge, $262.50 for this service?

A. *That's right. I have a fee for a certain procedure, because that's what I feel that it's worth.*

Q. *Now, do I understand you that you have not made any kind of a survey*

*among your colleagues to determine what they're charging for this service?*

A. That is true.

Q. Have you ever engaged in any fee review or peer review type activity in behalf of a medical association, an insurance company, or any other party?

A. No.

. . . .

(Emphasis added.)

Q. In spite of the fact that you have not made a survey, do you have any opinion as to whether or not your fees are higher than the reasonable, customary fees charged by other physicians for these services?

A. I object to that line of questioning.

Q. I just asked you if you had an opinion.

A. You'd asked me if I had an opinion—

Q. As to whether your fees were higher—

A. —As to whether my—were higher than their reasonable and customary fees—

Q. Well, this, let me—Well, let me ask you—

A. —Insinuating that mine were higher than reasonable and customary.

Q. Let me rephrase the question.

A. And "reasonable and customary" is your your term from Blue Cross-Blue Shield.

Q. Let me rephrase the question. Do you have an opinion as to whether the fee that you charged in this case was higher than—

THE COURT: Doctor, I'm going to have to ask you not to tap fingers. You're messing up her microphone. I'm sorry.

WITNESS CURNOW: All right.

BY MR. BAGBY:

*Q. I'll repeat the question. Do you have an opinion as to whether the fees that you charged in this case at the time in question were higher than the fees charged by your colleagues in this area for a similar service?*

*A. I don't know.*

. . . .

(Emphasis added.)

There is no reference to a "fee schedule" or "schedule of fees" upon which Dr. Curnow's charges were based, only a reference to a 1976 "relative value scale" which was used by plaintiff-respondent to determine his own fees originally. It is of at least passing interest to note that the "relative value scale" was obtained in 1976 from the Academy of Orthopedic Surgeons, a board of certification to which plaintiff-respondent was not yet admitted at the time of trial, and, the record appears void of proof that plaintiff-respondent's services at the time were reasonably equal in value to the services of board certified physicians.

The stubborn refusal of plaintiff-respondent to state that his charges for his services was reasonable and his unequivocal denial of any knowledge as to the charges made by others in the community for the same or similar services, not only constitutes a total failure of proof under our case law pertaining to quantum meruit[4], but it also constitutes a virtual self destruction of his own qualifications as an expert qualified to testify as to the value of such services in the community. I find no authority for the holding of the principal opinion that "Although evidence of what is charged by others in the community can be considered, it is not dispositive," and consider it to be a marked departure from our traditional

---

**4.** This factor distinguishes this case from *Bodde v. Burnham*, 588 S.W.2d 516 (Mo.App. 1979), cited in the principal opinion, in which the plaintiff testified as an expert with regard to the reasonable value of the labor he furnished. Although it was not stated explicitly in that case that the plaintiff was aware of the price customarily paid for labor like he furnished at the time and in the locality where he

furnished it, the court of appeals implied that plaintiff possessed such knowledge when it noted that he had been in the business for thirty-eight years. At any rate, it is clear that the plaintiff did not disclaim all knowledge of the customary charge for similar labor provided by others in the same locality, as Dr. Curnow did in the case at bar.

rules of proof of quantum meruit. I do not view the record of this case sufficient to support the judgment. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

The judgment below should be reversed and judgment entered for defendant-appellant. ˙

